798 A.2d 614 (2002)
351 N.J. Super. 328
Brian FRUGIS and Susan Frugis, Individually, and as guardians for their minor child, B.F., Plaintiffs-Respondents/Cross-Appellants,
v.
Samuel BRACIGLIANO, Defendant, and
The Elmwood Park Board of Education, Defendant-Appellant/Cross-Respondent.
Robert Hutzel and Jeane Hutzel, Individually, and as guardians for their minor child, R.H., Plaintiffs-Respondents/Cross-Appellants,
v.
Samuel Bracigliano, Defendant, and
The Elmwood Park Board of Education, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 2002.
Decided March 22, 2002.
Reconsideration Granted May 1, 2002.
*619 Christopher R. Carroll argued the cause for appellant/cross-respondent (Carroll, McNulty & Kull, attorneys; Mr. Carroll, of counsel and on the brief; James W. Gunson, Gladstone, on the briefs).
Herbert C. Klein, Roseland, argued the cause for respondents/cross-appellants (Nowell Amoroso Klein Bierman, attorneys; Mr. Klein, of counsel and on the brief; Sean M. Lipsky, on the briefs).
Before Judges PETRELLA, STEINBERG, and ALLEY. *615 *616 *617
*618 The opinion of the court was delivered by STEINBERG, J.A.D.
This appeal and cross-appeal arise from a lawsuit filed by two students, B.F. and R.H., and their parents against a former elementary school principal and a board of education, based on theories of intentional tort, negligence, and civil rights violations. In essence, plaintiffs B.F. and R.H. claimed they suffered severe and permanent psychological injuries as a result of being sexually abused by their elementary school principal, defendant Samuel Bracigliano, during 1988 and 1989. Brian and Susan Frugis, B.F.'s parents, and Robert and Jeane Hutzel, R.H.'s parents, claimed they suffered economic losses due to the medical expense and private school education costs that they incurred as a result of what happened to their sons. Plaintiffs asserted claims against the Elmwood Park Board of Education (Board) under theories of vicarious liability, negligent hiring, negligent supervision, and violation of civil rights, pursuant to 42 U.S.C. § 1983 (1994).[1] The two complaints were consolidated. Bracigliano did not file an answer or otherwise move as to the complaint. Consequently, a default was entered against him.
Bracigliano was the principal of Gilbert Avenue Elementary School in Elmwood Park from 1982 until his arrest on November 30, 1990. During that time, Bracigliano would call a number of students, mostly boys, to his office each day.
At trial, with the consent of the parties, the deposition of Patricia Showers, Bracigliano's secretary, was read to the jury. She said the window in his office door was covered with paper so that no one could see inside. In addition, the windows to the outside were obscured with hedges and brush. Again, no one could see inside. From her desk near the locked door, Showers could hear the clicking of a camera and the pop of flashbulbs going off.
In November 1990, the Bergen County Prosecutor's Office received reports of young boys being photographed by Bracigliano. A search warrant was issued. In executing the warrant, investigators discovered pornographic photographs, magazines, books, and videotapes in a locked room in Bracigliano's home. The investigators also found a small, black, metal index box located in a desk drawer in an office in Bracigliano's home. It contained 176 photographs of young boys in a *620 "spread-legged pose." In other words, the boys were seated with their legs spread open and hanging over the arms of the chair. It was determined that the photographs had been taken in Bracigliano's school office and that the photographs were of past and present students at the school.[2]
One of the photographs found at Bracigliano's home was of eight-year-old B.F. After Bracigliano was arrested, B.F.'s parents asked him about any involvement he might have had with Bracigliano. Reluctantly, B.F. advised his parents that he had been brought into Bracigliano's office on many occasions and had been photographed by him. He demonstrated to his parents how he had been photographed. He related that he had been asked to sit on Bracigliano's lap many times and, on one occasion, Bracigliano touched him on his penis. He also told his father that when he left the office, Bracigliano would give him a "swat" on his buttocks.
Jeane Hutzel testified that when she told her son, R.H., that Bracigliano had been arrested, he became hysterical but said Bracigliano had not done anything to him. However, she noticed that during the next few days, R.H.'s behavior was "totally off the wall." Ultimately, he related to her that Bracigliano used to call him to his office, lock the door, and pull down the shades. Once, Bracigliano unzipped R.H.'s pants to expose his underwear and took a photograph of him. On occasion, Bracigliano had R.H. remove his shirt and show his muscles for the camera. On these occasions, Bracigliano also took his shirt off. In addition, Bracigliano often called R.H. to the office and posed him in different positions in a chair. Bracigliano showed R.H. airline tickets to California and said that if he told anyone about the photographs, he would send him there and no one would ever find him. He also threatened to suspend R.H. from school if he told his parents what happened.
In the years that Bracigliano was principal, several staff members at the school noticed unusual incidents involving him and young male students. Joan E. Gerard, an ESL (English as a second language) teacher, testified that Bracigliano always preferred boys. She remembered one occasion when Bracigliano positioned a first-grade boy standing up against a wall while he rocked back and forth against the child. She felt "[i]t appeared ... sexual in nature." She was not aware of any procedure for reporting inappropriate conduct by the principal, so she reported the incident to a school nurse.
Rose Klink, a school nurse who occasionally substituted at the school, testified that on one occasion, a boy came into her office and stood in front of her desk. Bracigliano walked in, put his arms around the boy, and started to push against him from behind. She stood up and walked around the desk, at which point Bracigliano pulled away from the student. Klink said there was no system in place for reporting the principal to superiors. She said "we are supposed to report things to the principal."
Karen Rockefeller was a special education teacher at the school while Bracigliano was principal. One morning, she observed a student against the wall outside his classroom, and Bracigliano was in front *621 of the student "rocking back and forth and pushing into him." At the time, she did not think the incident was sexual in nature but, rather, thought it was intimidation. She also was unaware of any procedure for reporting a principal to his superiors.
Linda Herina, a sixth-grade teacher at the school, recalled one occasion when Bracigliano approached a student who was known to be shy and said, "You have to learn to talk more or Mr. B. is going to have to spank you." She told Bracigliano that she felt it was inappropriate to make such remarks to a sixth-grader. She also testified concerning an incident where two of her sixth-grade students had given a wrestling demonstration during an assembly. Upon their return, there was a note asking the boys to report to the office. They subsequently told Herina that Bracigliano had photographed them. One of the boys said he took his pants off. When she asked Bracigliano about this, he said he had no idea what she was talking about. Herina arranged for a conference with the boys and their mothers, but Bracigliano was arrested before the meeting could take place.
There was also evidence that members of the staff thought it was strange that the window on Bracigliano's office door was constantly covered and that his office was always dark. On one occasion, a State monitoring inspection resulted in the paper being removed from the window. However, after the monitoring team left the school, the paper was replaced on the window and it remained there.
William Savage was the wrestling coach at Elmwood Park High School from 1983 through 1986. At that time, the rules required that boys strip naked to be weighed before matches. Bracigliano frequently attended the weigh-ins during the four years that Savage was involved with the program, even though he was not on the high school faculty and had no duties in connection with the varsity wrestling program.
Savage asked the athletic director about Bracigliano and was told that he was involved in the lower grades' recreational wrestling program and wanted to observe varsity weigh-ins to see how they were done. Savage said he also spoke to Mike Scarpa, a member of the Board, about Bracigliano. Scarpa was a supporter of the wrestling team and often came to the locker room before a match to have a cigarette. Scarpa said that he also was concerned about Bracigliano attending the weigh-ins and asked Savage if he had ever noticed anything odd. Scarpa told Savage to keep an eye on Bracigliano and to tell him if anything happened.
Dr. Harry A. Galinsky, an educational consultant and long-time school administrator, testified on behalf of plaintiffs as an expert in the field of public administration and education. He said "there was an absolute absence of oversight" on the part of the Board and various superintendents. He also opined that had there been a reporting system in place, and had the superintendents been doing their job, the children would not have been harmed. He said "[t]hey were completely indifferent to what was going on in the school system." He noted that the superintendents did not personally visit the school to make periodic evaluations of Bracigliano as "required by law." He concluded that the performance of the superintendents did not rise to the level of the standard performance of superintendents around the State. He was particularly concerned about the covered window in Bracigliano's office door, claiming the practice was violative of N.J.A.C. 6:22-5.4. He believed that Bracigliano violated the regulation by covering the window and that this violation led directly to *622 the behavior that took place within the office.
In addition, Galinsky explained that every board of education has a responsibility to institute an effective reporting system so that it can be aware of what is happening within its schools. He concluded that the reporting system in effect in the Elmwood Park School District was grossly inadequate. He also opined that the superintendents made no effort to communicate with the teachers at the school to see how things were going. He suggested that superintendents should spend time in their buildings, particularly in a small district. Had that been done, the superintendents would have noticed the covered window and also would have had the opportunity to speak with staff members.
The Board did not present expert testimony to refute Galinsky's opinions. Rather, it presented testimony from John M. Santini, Superintendent of the Elmwood Park School District from 1978 to 1988. He said there were several reporting mechanisms available to teachers within the district. A teacher could report problems directly to the principal. There was a grievance procedure within the collective bargaining agreement that was broad enough to address many different issues. There was also an anonymous reporting procedure through the Division of Youth and Family Services.
Susan Frugis testified concerning personality changes in B.F. sometime during the first grade when he started having trouble falling asleep at night and having fears that he was going to die. She said that after Bracigliano's arrest, B.F.'s personality changed. He became withdrawn, argumentative, and distrustful.
In September 1991, B.F. was enrolled in a private, Catholic elementary school. He had trouble making friends and primarily became a loner. At the time of trial, B.F. was finishing his senior year and still had emotional difficulties. B.F. said that it was hard for him to adjust and make new friends. He said he consistently thought about what Bracigliano did to him. He was frequently depressed and often cried.
B.F.'s father testified that his son's therapist recommended taking him out of the Elmwood Park School District and putting him in private school. Consequently, in September 1991, he removed B.F., as well as his daughter, who is one year younger than B.F., from Gilbert Avenue Elementary School and enrolled them in St. Anne's. He said that prior to the revelations about Bracigliano, he and his wife had planned to send all of their children to public schools.
Dr. Michael Feldman, a psychiatrist, testified as plaintiffs' expert concerning his evaluation of B.F. He diagnosed B.F. as suffering from posttraumatic stress disorder and attention deficit hyperactivity disorder. He also found that B.F. suffered from depression and social phobia. He said "it's very probable that [B.F.'s] difficulties... [were] caused by the abusive experiences he had with [Bracigliano] at the school." He further opined that the psychological damage was permanent and significant. Finally, he said B.F.'s prognosis was "very guarded and potentially poor." In his opinion, the symptoms would increase in their impact for the rest of his life, rather than decrease.
Jeane Hutzel testified that her son, R.H., started kindergarten at Gilbert Avenue Elementary School. He began to have problems in the second grade and often asked if he could go to a different school. After Bracigliano's arrest, he became very upset. He began crying for no reason, was irritable, woke up at night with nightmares, sat up at night terrified, and antagonized his younger sisters for no reason. His parents withdrew him from *623 the school and enrolled him in St. Anne's. However, R.H.'s mother noticed he was "pathetically sad, just a miserable, unhappy kid" who could not fit in. She said other students at St. Anne's were aware of what had taken place and made fun of him, saying he was gay, and "was one of [Bracigliano's] boys. It was just humiliating." She said R.H.'s relationship with his parents, especially his father, was not good. She also testified that she and her husband were totally alienated from R.H., and he refused to involve them in any aspect of his life. She said she did not believe "he even has a self esteem. He just has a terribly low opinion of himself."
R.H.'s father testified that at the therapist's recommendation, he and his wife removed R.H. from the school and enrolled him in St. Anne's. At the end of the school year, they also removed their twin daughters, who are three-and-one-half years younger than R.H., from the school and enrolled them in St. Anne's as well. Prior to the incident with Bracigliano, they intended that all of their children would attend public school.
Dr. Feldman also testified as plaintiffs' expert concerning his evaluation of R.H. He said that although R.H. was generally better adjusted than B.F., he also had a significant emotional impairment. He opined that R.H. has significantly impairing depression and anxiety that are related to the sexual abuse by Bracigliano. He noted:
R.H. continued to suffer from residual symptoms of posttraumatic stress disorder, including intense psychological distress when reminded of abuse, avoidance of thoughts and feelings about the abuse, numbing of his emotionalof his emotions, as well as feeling detached from others and finally reporting excessive moodiness and angry outbursts. And a significantly increased need to be on the alert and in control of his surroundings.
He also testified that R.H. suffered from dysthymia, which is "a type of a depressive disorder, characterized by a sad and irritable mood," low self esteem, and a mixed disturbance of sleep, appetite, and energy level. He indicated that R.H.'s "current problems [were] probably due to the episodes of sexual abuse that he experienced at Gilbert."
Dr. Feldman stated that R.H.'s "psychological damages are permanent." He felt R.H.'s problems would likely intensify at critical stages in his life and the symptoms could be triggered and potentially reoccur at different developmental milestones such as finishing school, moving away from home, beginning work, finding work, finding a partner, and starting a family. He concluded that the prognosis is poor "in the sense of expecting a full remission." However, with treatment, the condition "could be ameliorated or modified."
Dr. David J. Gallina, a neuropsychiatrist, testified as an expert on behalf of the Board. He stated that B.F. had a history of "severe developmental delays, some neurological problems, attention deficit hyperactivity disorder, learning problems, social difficulties with peers, ... [and] a lot of anxiety and some emotional problems about that, even before this incident with the principal." Although the incident worsened his anxiety for a while, Dr. Gallina felt that B.F. did not have a serious neuropsychiatric diagnosis. He said B.F. was "not a sick kid."
Dr. Gallina expressed similar feelings concerning R.H. He said that R.H. was not suffering from any serious neuropsychiatric illness. While R.H. still had residual symptoms of anxiety, they did not rise to the level of a serious psychiatric illness. He said neither B.F. nor R.H. suffered from posttraumatic stress disorder.
*624 Prior to closing arguments, plaintiffs moved, pursuant to R. 4:40-1, for the entry of judgment in their favor regarding the liability of the Board and Bracigliano on the negligence claims. The judge granted the motion. The jury returned a verdict in favor of the Board on the § 1983 civil rights claim. On the negligence claims, the jury awarded compensatory damages to B.F. and R.H. in the amount of $275,000 each, to Brian and Susan Frugis, B.F.'s parents, in the amount of $117,000, and to Robert and Jeane Hutzel, R.H.'s parents, in the amount of $109,250.
Simultaneously, at plaintiffs' request, the court entered judgment against Bracigliano on all counts of the complaint, including the civil rights claim, and found that punitive damages and counsel fees were warranted. However, the amount of the punitive damage award was to be fixed by supplemental judgment after a further hearing. Additionally, counsel fees were to be fixed based upon a certification to be submitted by plaintiffs' counsel.
On this appeal, the Board raises the following arguments:
I. THE TRIAL COURT ERRED BY DIRECTING A VERDICT AGAINST ELMWOOD PARK ON THE ISSUE OF NEGLIGENCE.
A. The Trial Court Improperly Directed a Verdict Against Elmwood Park.
B. The Trial Court Erred by Precluding the Jury From Considering Whether Plaintiffs' Injuries Satisfied the Tort Claims Threshold.
C. The Trial Court Erred in Its Instruction to the Jury Directing a Verdict in Favor of Plaintiffs.
II. THE TRIAL COURT ERRED BY REFUSING TO ALLOW THE JURY TO APPORTION LIABILITY BETWEEN BRACIGLIANO AND ELMWOOD PARK.
III. THE TRIAL COURT ERRED IN ITS DETERMINATION OF WHAT DAMAGES WERE COMPENSABLE TO THE PLAINTIFFS.
IV. THE JURY'S VERDICT IN FAVOR OF THE HUTZELS AND FRUGISES IS AGAINST THE WEIGHT OF THE EVIDENCE.
V. THE TRIAL COURT'S DENIAL OF ELMWOOD PARK'S MOTION FOR SUMMARY JUDGMENT BASED ON A MISAPPLICATION OF CONTROLLING LAW MANDATES REVERSAL.
A. The Trial Court Erred in Its Refusal to Apply N.J.S.A. 59:2-10 to the Facts of this Case.
B. The Trial Court Erred in Its Refusal to Apply N.J.S.A. 59:9-2(d) to the Facts of this Case.
C. The Trial Court Erred in Its Refusal to Grant Summary Judgment to Elmwood Park on Plaintiff's Negligent Supervision Claim.
In their cross-appeal, plaintiffs argue that the appeal should be dismissed because it was not timely filed; the judge erred in failing to issue a directed verdict on their § 1983 claims; the judge's charge on the § 1983 claims was erroneous; and the judge erred in not submitting to the jury B.F.'s and R.H.'s claims of lost future income.

I.
We first consider plaintiffs' contention, raised in their cross-appeal, that the Board's appeal should be dismissed because it was not timely filed. The jury verdict resulting in an award of a specific dollar amount to plaintiffs was returned on *625 June 6, 2000. R. 2:4-1(a) requires appeals from final judgments to be taken within forty-five days of their entry. Thus, plaintiffs contend that the Board's notice of appeal was due on or before July 21, 2000. Consequently, since the notice of appeal was not filed until July 31, 2000, plaintiffs contend that it is untimely and must be dismissed.
The forty-five day period begins to run when the judgment or order appealed from is entered pursuant to R. 4:47. Beck v. Beck, 239 N.J.Super. 183, 189, 570 A.2d 1273 (App.Div.1990); Pogostin v. Leighton, 216 N.J.Super. 363, 370, 523 A.2d 1078 (App.Div.), certif. denied, 108 N.J. 583, 531 A.2d 1356, cert. denied, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). R. 4:47(a) requires "the clerk [to] forthwith prepare, sign, and enter the judgment in the Civil Docket without awaiting further direction by the court" if plaintiff has recovered a verdict "accompanied by answers to interrogatories which is forthwith convertible by the court into a money judgment." The rule further provides that once the proponent of the judgment pays the statutorily prescribed fee, the judgment must be entered in the Civil Judgment and Order Docket.
The timeliness of an appeal is to be determined with reference to the date on which the judgment is docketed, not the date on which it is signed by the court. Pogostin, supra, 216 N.J.Super. at 370, 523 A.2d 1078. Preliminarily, we note that it has not been demonstrated to us that the judgment was in fact timely docketed. Experience has shown that judgments are not always docketed on the date the jury returns the verdict. Moreover, the jury verdict did not determine all of the claims against Bracigliano. There still remained to be determined the award of punitive damages and attorney fees against him. In order for a judgment to be considered final, and consequently appealable as of right, it must be final both as to all issues and all parties. Gloucester City Bd. of Educ. v. Am. Arbitration Ass'n, 333 N.J.Super. 511, 519, 755 A.2d 1256 (App. Div.2000). Here, as previously noted, the amount of punitive damages, as well as the amount of counsel fees, were still to be determined. Consequently, the judgment was not final. The parties have not established that the remaining claims have ever been determined, or if they were, the date of their determination. Therefore, it appears that the appeal is interlocutory, requiring leave of court. R. 2:2-4. While the appeal may be subject to dismissal on that basis, we elect to consider it on its merits as it has been fully briefed and argued. Thus, to the extent necessary, we grant leave to appeal nunc pro tunc pursuant to R. 2:4-4(b)(2).

II.
We next consider the Board's contention that the judge erred in granting plaintiffs' motion made pursuant to R. 4:40-1, for a directed verdict against the Board on the issue of negligence. The court reasoned:
[T]he superintendent did not act as the chief executive officer of the Board of Education [and] follow up on a known infraction of the New Jersey Administrative Code, namely the covering of the principal's window.
He, on one occasion, told the principal to take it down, it was taken down, but there was no follow up, no fact follow up in this record exists, so there was a clear inaction whose effect was to allow the principal to continue to have children locked behind the closed door in his office without anyone seeing in or out.
In addition, there is not a scintilla of evidence on this record that the Board of Education through its superintendent *626 or otherwise trained any personnel on how to report anything that was sufficiently out of the ordinary to report, first of all, what might that constitute and how might you do that, and to whom might you report it if it's the principal who's involved?
In other words, they thwarted the ability of every teacher in the school and the secretary and the janitor all of whom seemed to know what was happening, thwarted anyone's ability to adequately meet the challenge of what is happening in this office and why at an early stage that would have salvaged the principal's career, for starters, and also salvaged 176 or some significant portion of those young men who now have to live with this every day of their lives.
... There is no other proximate cause for what happened to these boys other than the inseparable combination of the action and inaction of the mind of authority intended to protect and educate these minor boys.
And, therefore, there is no other conclusion that the court can reach, nor can any reasonable juror reach, than that there is negligence by the [Board] with regard to the two victims here....
In considering a motion for a directed verdict pursuant to R. 4:40-1, the trial court must determine whether
"the evidence, together with the legitimate inferences therefrom, could sustain a judgment in ... favor" of the party opposing the motion, [i.e.], if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.

[Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969) (citations omitted).]
As in a summary judgment motion, in considering a motion for a directed verdict, the judge must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995) (citation omitted). However, the judge must resolve all legitimate inferences in favor of the nonmoving party. Id. at 540, 666 A.2d 146. If reasonable minds may differ as to whether negligence has been shown, the motion must be denied.
On appeal, we employ the same standard as the trial court in reviewing the ruling on a motion for a directed verdict. Luczak v. Township of Evesham, 311 N.J.Super. 103, 108, 709 A.2d 305 (App. Div.), certif. denied, 156 N.J. 407, 719 A.2d 639 (1998). While the court may direct a verdict on the question of negligence if there are neither disputed facts nor disputed inferences to be drawn from the uncontroverted facts, ordinarily, the question of negligence is a question best reserved for the jury. Ambrose v. Cyphers, 29 N.J. 138, 145-46, 148 A.2d 465 (1959); Arvanitis v. Hios, 307 N.J.Super. 577, 582, 705 A.2d 355 (App.Div.1998); Brendel v. Pub. Serv. Elec. & Gas Co., 28 N.J.Super. 500, 511, 101 A.2d 56 (App.Div.1953); Gentile v. Pub. Serv. Coordinated Transp., 12 N.J.Super. 45, 49-50, 78 A.2d 915 (App. Div.1951).
*627 The mere fact that evidence is uncontradicted or uncontroverted does not render it conclusive. Ferdinand v. Agric. Ins. Co., 22 N.J. 482, 494, 126 A.2d 323 (1956); Corcoran v. Hartford Fire Ins. Co., 132 N.J.Super. 234, 243, 333 A.2d 293 (App.Div.1975). Thus, if rational fact-finders would entertain differing views as to the credibility of the testimony, whether it be uncontradicted, uncontroverted, or even undisputed, the credibility of the evidence must be submitted to the jury. Ferdinand, supra, 22 N.J. at 494, 126 A.2d 323; Corcoran, supra, 132 N.J.Super. at 243-44, 333 A.2d 293. Stated another way, even though the evidence is uncontradicted, if reasonable fact-finders can draw different inferences from the testimony and evidence, a jury question is presented.
We recognize that it was virtually undisputed that Bracigliano kept the window in his office door covered for most of his seven-and-one-half years at Gilbert. This practice was contrary to N.J.A.C. 6:22-5.4, which required doors to rooms used by school staff to have a safety vision panel.[3] However, ordinarily, the violation of an administrative regulation is not "a basis for assigning negligence as a matter of law." Alloway v. Bradlees Inc., 157 N.J. 221, 236, 723 A.2d 960 (1999). Rather, the violation of a statute or administrative regulation is evidence of negligence provided plaintiff was a member of the class for whose benefit the legislative standard of conduct was established. Ibid. Here, we have little doubt that one of the purposes of the regulation was to protect the safety of students within the school. Consequently, plaintiffs were a member of the class intended to be benefitted by it. However, violation of the regulation was not, under these circumstances, negligence per se.
Moreover, even though there was evidence of Bracigliano's unusual conduct and also evidence that the Board did nothing in response, we nevertheless conclude that plaintiffs had not established the negligence of the Board as a matter of law. In other words, giving the Board the benefit of all inferences which could reasonably and legitimately be deduced from the evidence, reasonable minds could have differed as to whether it was negligent. While the evidence of Bracigliano's misconduct was overwhelming, the fact still remains that a reasonable fact-finder could have found that, under all the circumstances, the Board was not negligent.

III.
We next consider the Board's contention regarding the comments the trial judge made to the jury after she had directed a verdict in favor of plaintiffs on the question of liability. Because we have decided to reverse on other grounds, we need not encumber this opinion with all of the comments made by the judge. However, in advising the jury immediately prior to summations that it would not be considering the issue of liability, she told the jury that "certain other facts are so overwhelming" relating to the claim of negligence that she had "made a determination about them already." The judge went on to advise the jury regarding the facts that led to her conclusion that the Board was negligent as a matter of law. Indeed, at times, the comments sounded like a summation to the jury. A judge must remain impartial, detached, and should neither take sides nor appear to take sides in the dispute. State v. Swint, 328 N.J.Super. 236, 260, *628 745 A.2d 570 (App.Div.), certif. denied, 165 N.J. 492, 758 A.2d 651 (2000). While a judge "possesses a broad discretion as to his or her participation in the trial," the judge must, at the same time, "maintain an atmosphere of impartiality." Ibid. A judge must never be perceived as an advocate. Suffice it to say that here, the judge merely should have advised the jury that as a result of a legal determination, it would not be called upon to decide the issue of negligence.

IV.
We next consider, and reject, plaintiffs' contention that even if we conclude that the negligence issue should have been submitted to the jury, the judgment should not be reversed. The basis of that contention is the fact that the jury, on the civil rights claim, found that plaintiffs had proven by a preponderance of the evidence that the Board "had or should have had knowledge of the risk to which [Bracigliano] placed the two plaintiffs B.F. and R.H." and also found that the Board "had or should have known the harm that could occur" to them from the risk. First of all, those conclusions were reached on a different claim and were accompanied by a finding that the Board had not made a conscious decision to take no action to inquire into Bracigliano's conduct and also that the Board did not act with deliberate indifference by taking manifestly inadequate action. Moreover, and more importantly, we cannot, with any degree of confidence, conclude that the jury's findings were not affected by the remarks made by the judge to the jury regarding her determination that the evidence of the Board's negligence was overwhelming. While a judge may comment on the evidence, those comments "should be temperately and fairly made, and should not be argumentative or contentious to a degree which makes it characteristically an act of advocacy." State v. Jones, 104 N.J.Super. 57, 62, 248 A.2d 554 (App.Div.1968), certif. denied, 53 N.J. 354, 250 A.2d 755 (1969) (citation omitted).

V.
We next consider the Board's contention that the trial judge erred in concluding that plaintiffs had satisfied the threshold requirement of the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3. The threshold is set forth in N.J.S.A. 59:9-2(d), and is intended to "preclude recovery for pain and suffering based on subjective evidence or minor incidents." Collins v. Union County Jail, 150 N.J. 407, 413, 696 A.2d 625 (1997). At the time of trial, N.J.S.A. 59:9-2(d) provided that damages would not be awarded against either a public entity or public employee "for pain and suffering resulting from an injury, in the absence of permanent loss of a bodily function, permanent disfigurement, or dismemberment, further providing the medical treatment expenses exceeded $1000."[4] Thus, in order to cross the TCA's threshold, "a plaintiff must prove `(1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial.'" Kahrar v. Borough of Wallington, 171 N.J. 3, 12, 791 A.2d 197 (2002) (quoting Gilhooley v. County of Union, 164 N.J. 533, 541, 753 A.2d 1137 (2000)).
Initially, the Board contends that the judge erred in "ruling before she had heard the testimony" of its expert. We reject that contention as being without sufficient merit to warrant extended discussion. R. 2:11-3(e)(1)(E). Suffice it to say that the Board made its motion prior to *629 the testimony of its expert and cannot be heard to complain on appeal that the judge did not consider the expert's testimony in evaluating the motion.
In addition, we conclude that when considered in the light most favorable to plaintiffs, there was sufficient evidence to support a determination that they had crossed the threshold. In Collins, supra, 150 N.J. at 420-21, 696 A.2d 625 (1997), our Supreme Court held that a plaintiff's claim of permanent psychological harm in the form of posttraumatic stress disorder resulting from the aggravated circumstance of being raped by a corrections officer may constitute a "permanent loss of a bodily function" even without residual physical injury, within the meaning of N.J.S.A. 59:9-2(d).
Here, although the victims were not raped, we conclude that the allegations of sexual abuse or molestation and also being photographed by Bracigliano in a sexual manner are sufficient aggravating circumstances which, if accompanied by a permanent posttraumatic stress disorder, which is substantial, constitutes a "permanent loss of a bodily function" even without residual physical injury. Id. at 413, 696 A.2d 625; see also C.P. by J.P. v. Township of Piscataway Bd. of Educ., 293 N.J.Super. 421, 430-31, 681 A.2d 105 (App. Div.1996) (suggesting that a minor who had been subjected to an act of sexual contact by a swim instructor could cross the verbal threshold, provided plaintiff demonstrates a permanent psychological disability resulting from the molestation); A.C.R. by L.R. v. Vara, 264 N.J.Super. 565, 571-72, 625 A.2d 41 (Law Div.1992) (holding that sexual assault of a minor resulting in psychological harm may be compensable under the TCA, even in the absence of personal injury).
However, we agree with the Board that if there is a factual dispute as to whether plaintiffs' injuries were sufficient to cross the threshold, the jury must decide the issue rather than the judge as a matter of law. Stated another way, the trial court, in its gatekeeping function, determines whether there is sufficient evidence that plaintiffs crossed the threshold to allow submission of the issue to the jury. However, as in all cases where there are factual disputes, the jury renders the ultimate decision. It is the judge's function only to decide if a material dispute of fact exists as to whether plaintiffs crossed the threshold. Gilhooley, supra, 164 N.J. at 545, 753 A.2d 1137; Hammer v. Township of Livingston, 318 N.J.Super. 298, 310, 723 A.2d 988 (App.Div.1999).
Thus, on remand, if there is a factual dispute, the jury, not the judge, must determine whether plaintiffs have sustained a "permanent loss of a bodily function." See N.J.S.A. 59:9-2(d). Simply put, the conflicting expert testimony at trial, at the very least, raised a factual dispute as to whether plaintiffs' psychological injuries were permanent and substantial, and thus rose to a level sufficient to cross the threshold of the TCA. Consequently, on remand, the jury shall be instructed that plaintiffs must prove, by a preponderance of the credible evidence, that they suffered a substantial and permanent loss of a bodily function proximately caused by the Board's conduct. The jury should also be instructed that permanent psychological harm in the form of posttraumatic stress disorder which is substantial may constitute a permanent loss of a bodily function within the meaning of N.J.S.A. 59:9-2(d). Collins, supra, 150 N.J. at 420-21, 696 A.2d 625.

VI.
We next consider the Board's contention that the trial court erred by refusing *630 to direct the jury to apportion liability between Bracigliano and the Board. Specifically, the Board claims that pursuant to the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, and N.J.S.A. 59:9-3.1, the jury should have been directed to apportion liability between the Board, a negligent tortfeasor, and Bracigliano, an intentional tortfeasor. The Board contends that assigning it full responsibility for plaintiffs' injuries effectively resulted in it being held vicariously liable for Bracigliano's intentional criminal conduct.
Under the Comparative Negligence Act, contributory negligence does not necessarily bar recovery. N.J.S.A. 2A:15-5.1; Blazovic v. Andrich, 124 N.J. 90, 98, 590 A.2d 222 (1991). Rather, a plaintiff found either to be equally negligent as or less negligent than a defendant is not barred from recovery. Blazovic, supra, 124 N.J. at 98, 590 A.2d 222. Instead, the recovery is "diminished by the percentage of negligence attributed to the plaintiff by the trier of fact." Ibid. In addition to determining the amount of damages, the fact-finder must also determine the "percentage[ ] of each party's negligence or fault." N.J.S.A. 2A:15-5.2(a)(1), (2). Finally, "[t]he percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%." N.J.S.A. 2A:15-5.2(a)(2).
To be sure, "responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional tortfeasor." Blazovic, supra, 124 N.J. at 107, 590 A.2d 222. Apportionment of liability affects the liability among joint tortfeasors pursuant to the Joint Tortfeasors Contribution Act and, ordinarily, the amount of plaintiff's potential recovery. Id. at 103, 590 A.2d 222. The Comparative Negligence Act was amended in 1995 after Blazovic had been decided, making it clear that the fact-finder must apportion all fault attributable to each party. Indeed, the Comparative Negligence Act now specifically provides that "[t]he percentage of negligence or fault of each party shall be based on 100%." N.J.S.A. 2A:15-5.2(a)(2) (emphasis added). Thus, it is clear that allocation is ordinarily required between negligent actors and intentional actors.
In Blazovic, the Court acknowledged a line of cases in which it had
precluded defendants from relying on a plaintiff's negligence to offset the defendant's duty, under circumstances in which the defendant's duty encompassed the obligation to prevent the plaintiff's allegedly-inappropriate conduct. Cf. Cowan v. Doering, 111 N.J. 451, 458-67[, 545 A.2d 159] (1988) (hospital could not assert contributory negligence as defense when its duty included exercise of reasonable care to prevent plaintiff from engaging in self-damaging conduct); Suter [v. San Angelo Foundry & Mach. Co., 81 N.J. 150], 165-68, [406 A.2d 140 (1979) ] (comparative negligence not available as defense in products-liability case when factory worker sustains injury while using unsafe machine for its intended purpose); Soronen v. Olde Milford Inn, Inc., 46 N.J. 582, 589-92[, 218 A.2d 630] (1966) (contributory negligence not available as defense to tavern keeper who negligently sells alcoholic beverages to visibly-intoxicated customer, proximately contributing to resulting injury).

[Blazovic, supra, 124 N.J. at 111, 590 A.2d 222.]
The basis of those decisions was that allowing a comparative-negligence defense *631 could "lead to the dilution or diminution of a duty of care." Ibid. (citation omitted); see also Conklin v. Hannoch Weisman, 145 N.J. 395, 412, 678 A.2d 1060 (1996) (holding that in a legal malpractice case, a jury cannot consider the client's conduct as contributory negligence unless the client disregarded the advice of an attorney); Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 338, 643 A.2d 1 (1994) (holding that "when a health-care professional's duty includes [the] exercise of reasonable care to prevent [an aged, incapacitated, or infirm] patient from engaging in self-damaging conduct, the health-care professional may not assert contributory negligence as a defense to a claim arising from the patient's self-inflicted injuries"); Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc., 249 Kan. 348, 819 P.2d 587, 606 (1991) (holding that a bus driver's intentional misconduct in sexually molesting a student could not be compared to the negligence of school districts and transportation services in failing to take steps to protect the student from such intentional misconduct); Veazey v. Elmwood Plantation Assocs., Ltd., 650 So.2d 712, 719 (La.1994) (holding that the trial judge did not err in refusing to allow apportionment of liability of negligent landlord and rapist in light of the landlord's responsibility to protect against the possibility of sexual assault and noting that any rational jury would apportion the majority of the fault to the intentional tortfeasor which "would operate to reduce the incentive of the [landlord] to protect against the same type of situation occurring again in the future"). Thus, plaintiffs contend that there should be no apportionment because the Board was responsible for protecting against the intentional misconduct of its employees such as Bracigliano.
While plaintiffs' contention has attraction and potential merit, we conclude that N.J.S.A. 59:9-3.1 requires its rejection. The statute provides, as follows:
Notwithstanding the provisions of [the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8,] or any other law to the contrary, in any case where a public entity or public employee acting within the scope of his employment is determined to be a tortfeasor in any cause of action along with one or more other tortfeasors, the public entity or public employee shall be liable for no more than that percentage share of the damages which is equal to the percentage of the negligence attributable to that public entity or public employee and only to the extent authorized by [N.J.S.A. 59:9-2 and N.J.S.A. 59:9-4].
The legislative history of N.J.S.A. 59:9-3.1 indicates that its specific purpose was to eliminate joint and several liability for public entities. The Senate Judiciary Committee reported that the proposed bill "would modify `joint and several liability' in cases when a public entity or a public employee within the scope of his employment is a defendant." S. Judiciary Comm., Statement to Senate, S. 202-375, 1st Sess. (N.J.1986), reprinted in Margolis & Novack, Claims Against Public Entities 221 (2002). The Assembly Insurance Committee noted that public entities were often the defendants with the most assets, i.e., "deep pockets," and, under the doctrine of joint and several liability, were required to contribute to judgments out of proportion to their degree of negligence. Assemb. Ins. Comm., Statement to Senate, S. 202-375, 2d Sess. (N.J.1987), reprinted in Margolis & Novack, supra, at 222-23. The Committee also noted that the proposed bill would eliminate joint and several liability for public entities by limiting recovery to the amount *632 of the judgment directly attributable to the negligence of the public entity. Id. at 222. We conclude that N.J.S.A. 59:9-3.1 sets forth in clear and unequivocal terms that notwithstanding the provisions of any other law, specifically, but not limited to, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, and the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, a public entity shall not be required to contribute more than the percentage share of damages allocated to it by the factfinder.
In construing a statute, we must first examine its provisions "to ascertain whether they are expressed in plain language that, in accordance with ordinary meaning, clearly and unambiguously yields only one interpretation." Richard's Auto City, Inc. v. Dir., 140 N.J. 523, 531, 659 A.2d 1360 (1995). In addition, whatever rule of statutory construction is employed, "it is subordinate to the goal of effectuating the legislative plan as it may be gathered from the enactment `when read in full light of its history, purpose, and context.'" State v. Haliski, 140 N.J. 1, 9, 656 A.2d 1246 (1995) (citations omitted). When the language of a statute is clear, we must interpret it as written and may not inject our own notions of fairness or public policy. O'Boyle v. Prudential Ins. Co. of Am., 241 N.J.Super. 503, 509, 575 A.2d 515 (App.Div.1990). Thus, a court is not permitted to substitute its judgment to contradict the plain and unambiguous language of the statute. Consequently, we determine that on remand the judge must require the jury to apportion the fault of the Board and the fault of Bracigliano. Moreover, the Board's responsibility should not be more than the percentage of fault attributed to it by the jury. N.J.S.A. 59:9-3.1. If there is to be a change, it must be made by the Legislature.[5]

VII.
We next consider plaintiffs' contention that the trial judge erred in not allowing the jury to consider their claims for lost future income. We reject that contention. "Generally, appellate courts review a trial court's determination of the admissibility of evidence for an abuse of discretion." State v. Harvey, 151 N.J. 117, 166, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). "An injured party has the right to recover damages for the prospective consequences of a tortious injury as long as there is a reasonable probability that such consequences will occur." Costantino v. Ventriglia, 324 N.J.Super. 437, 450, 735 A.2d 1180 (App.Div.1999), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000). Thus, if there is an adequate factual basis for an award, an injured party may recover damages for diminished earning capacity. Caldwell v. Haynes, 136 N.J. 422, 433, 643 A.2d 564 (1994); Dombroski v. City of Atlantic City, 308 N.J.Super. 459, 469, 706 A.2d 242 (App.Div.1998).
*633 In order to allow submission to the jury of a claim for diminished earning capacity, a plaintiff must introduce evidence "showing there is a reasonable probability that his injuries will impair his future earning capacity." Coll v. Sherry, 29 N.J. 166, 176, 148 A.2d 481 (1959). In addition, plaintiff must provide a sufficient factual basis upon which the jury can reasonably determine the quantum of diminishment. Ibid.; Dombroski, supra, 308 N.J.Super. at 469, 706 A.2d 242. Plaintiff must show a reasonable probability that the injuries will impair his or her future earning capacity. A mere possibility is insufficient. Costantino, supra, 324 N.J.Super. at 450, 735 A.2d 1180.
Ordinarily, an expert must "offer an opinion based on a reasonably probable prediction, and not a mere guess or conjecture." Id. at 450-51, 735 A.2d 1180. Expert testimony based on unfounded speculation or mere possibility is not only insufficient but also inadmissible. See id. at 451, 735 A.2d 1180. However, due to the difficulty, if not impossibility, in determining the prospective employment of an infant, our Supreme Court has held that expert testimony is not necessary, in all cases, involving a minor. Lesniak v. County of Bergen, 117 N.J. 12, 31, 563 A.2d 795 (1989). While the severe nature and lasting extent of the injury must be established by expert testimony, in cases involving a minor, expert testimony is not required "as a general rule, to establish the quantum of earning-capacity loss." Id. at 32, 563 A.2d 795.
Here, the only testimony regarding diminished future earnings was provided by Dr. Feldman. He asserted that B.F. will have "significant problems" presenting himself in job interviews or being assertive in a career. He further said that R.H. would likely have difficulties with interviewing or employment "if he perceived that the authority figures were people who might be either critical of him or suspicious of him."
Although B.F. and R.H. were infants when they were injured, they were both eighteen years old at the time of trial. B.F. was about to graduate from high school where, according to his mother, he was an excellent student. R.H. had completed one year at the College of New Jersey, where he was studying computer science. He also had excellent grades in high school and scored over 1200 in the Scholastic Aptitude Test. Here, unlike Lesniak, there was a basis for an expert to provide an opinion as to the future earning capacity of B.F. and R.H. in light of their age. Consequently, under these circumstances, we conclude that the judge did not mistakenly exercise her discretion in refusing to submit the issue to the jury.

VIII.
Finally, we have carefully considered the record, the briefs filed, the applicable law, as well as the arguments of counsel, and conclude that the remaining issues raised on the appeal and cross-appeal, to the extent not mentioned in this opinion, are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).
On the Board's appeal, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. With respect to plaintiffs' cross-appeal, we affirm on all issues.
NOTES
[1] The Board's motion for summary judgment as to plaintiffs' punitive damages and negligent hiring claims were granted. That determination has not been appealed.
[2] Following a lengthy jury trial, Bracigliano was convicted on four counts of official misconduct and an aggregate sentence of seventeen years of imprisonment was imposed. We reversed the convictions on three of the counts, but upheld the conviction for official misconduct that was based on the taking and retaining of the boys' pictures for sexual gratification. State v. Bracigliano, No. A-3825-91 (App.Div. Jan. 4, 1995), certif. denied, 141 N.J. 96, 660 A.2d 1195 (1995). We remanded for resentencing.
[3] We note that N.J.A.C. 6:22-5.4 was repealed, effective October 1, 2001, after the acts complained of. The regulation was recodified in essentially similar terms as N.J.A.C. 6A:26-6.2(c)(4).
[4] Subsequently, N.J.S.A. 59:9-2(d) was amended, effective September 21, 2000, by requiring the medical expenses to exceed $3600.
[5] Initially, we had held that there should be no allocation. See S.P. v. Collier High Sch., 319 N.J.Super. 452, 468-69, 725 A.2d 1142 (App.Div.1999). We relied upon our strong public policy of protecting children from sexual abuse. Id. at 468, 725 A.2d 1142. We also noted that a board of education which has knowledge of potentially criminal or otherwise wrongful conduct has a duty to prevent injuries to its students. Id. at 468-69, 725 A.2d 1142. We held that allowing allocation would have the potential of diluting the primary responsibility of the Board to provide a safe haven to its students and to act swiftly and decisively when there are signals that the students are in jeopardy. In the present case, the Board moved for reconsideration, raising for the first time in that application the applicability of N.J.S.A. 59:9-3.1. We requested and reviewed supplemental briefs regarding the applicability of the statute. For the reasons indicated above, we granted the motion for reconsideration and now hold that the statute requires allocation.