827 A.2d 1040

BRIAN FRUGIS AND SUSAN FRUGIS, INDIVIDUALLY AND AS GUARDIANS FOR THEIR MINOR CHILD, B.F., PLAINTIFFS–APPELLANTS, v. SAMUEL BRACIGLIANO, THE BOROUGH OF ELMWOOD PARK AND JOHN DOE I & II (INDIVIDUALS WHOSE IDENTITIES ARE AS YET UNKNOWN), DEFENDANTS, AND THE ELMWOOD PARK BOARD OF EDUCATION, DEFENDANT–RESPONDENT.

ROBERT AND JEANNE HUTZEL, INDIVIDUALLY, AND AS GUARDIANS FOR THEIR MINOR CHILD, R.H., PLAINTIFFS–APPELLANTS, v. SAMUEL BRACIGLIANO, THE BOROUGH OF ELMWOOD PARK AND JOHN DOE I & II (INDIVIDUALS WHOSE IDENTITIES ARE AS YET UNKNOWN), DEFENDANTS, AND THE ELMWOOD PARK BOARD OF EDUCATION, DEFENDANT–RESPONDENT.

Argued December 3, 2002—Decided July 28, 2003.

*Herbert C. Klein,* argued the cause for appellants (*Nowell Amoroso Klein Bierman,* attorneys; *Mr. Klein* and *Sean M. Lipsky,* on the briefs).

*Christopher R. Carroll,* argued the cause for respondent (*Carroll, McNulty & Kull,* attorneys; *Mr. Carroll* and *James W. Gunson,* on the brief).

The opinion of the Court was delivered by

ALBIN, J.

Defendant Samuel Bracigliano, the former principal of the Gilbert Avenue Elementary School in Elmwood Park, photographed scores of young male students in provocative poses and retained those photographs for his sexual gratification. As a result, he was charged with and convicted of official misconduct, *N.J.S.A.* 2C:30–2a. *Frugis v. Bracigliano*, 351 *N.J.Super.* 328, 339 n. 2, 798 *A.*2d 614 (App.Div.2002). The parents of two of the victimized students, individually and on behalf of their children, sued Bracigliano and the Elmwood Park Board of Education (Board). Although various theories of liability were asserted in the complaints, the focus of the appeal before us is plaintiffs' allegation that the Board negligently supervised Bracigliano, causing emotional and economic injuries to the two families. We must determine whether the evidence presented against the Board at trial was so overwhelming as to justify a directed verdict in favor of plaintiffs. We must also determine whether, if the Board is liable, apportionment of damages between the negligent Board and the intentional tortfeasor principal is required pursuant to the Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3, or whether such apportionment is contrary to public policy because it would dilute the responsibility of the Board to protect the children from the very harm it should have anticipated—the principal's wrongful acts. Last, we must decide whether the trial court properly exercised its discretion in not submitting the issue of diminished earning capacity to the jury.

I.

On August 11, 1993, plaintiffs Brian and Susan Frugis, the parents of then ten-year-old B.F., and Robert and Jeanne Hutzel, the parents of then eleven-year-old R.H., filed separate but similar ten-count complaints, individually and on behalf of their sons, naming Bracigliano and the Board as defendants. Plaintiffs asserted common-law claims of negligence, intentional infliction of emotional distress, false imprisonment, and invasion of privacy

against Bracigliano, and claims of negligent hiring, negligent supervision, and vicarious liability against the Board. Plaintiffs also claimed that both defendants violated B.F.'s and R.H.'s civil rights under 42 *U.S.C.A.* § 1983. The plaintiff parents sought reimbursement for medical and private school tuition expenses. Although the Board answered by denying the allegations, Bracigliano failed to respond, and ultimately, default judgment was entered against him.

The complaints were consolidated for trial and protracted pretrial proceedings ensued. The trial court dismissed the punitive damages and negligent hiring claims against the Board on summary judgment. At a ten-day trial in 2000, the jury heard the testimony of eighteen witnesses. We summarize the relevant portions of that testimony in considering this appeal.

## A.

Bracigliano was the principal of the elementary school from 1982 until his arrest on November 29, 1990, when investigators discovered an assortment of pornographic photographs and videotapes in his home. The investigators also found 176 photographs of past and present male students, each depicting a similar pose—a clothed boy seated in a chair with his legs spread wide apart, and one leg dangling over each arm of the chair. Bracigliano had taken those photographs in his elementary school office. One of the photographs of a child in the so-called "spread-legged pose" was of B.F. No photograph of R.H. was discovered.

As soon as Bracigliano assumed his post as principal of the elementary school, he blocked the view into his office by covering the 12″ × 12″ window in his office door with a paper picture. Obscuring that window violated *N.J.A.C.* 6:22–5.4(c),[1] which re-

---

[1] *N.J.A.C.* 6:22–5.4(c) was repealed effective October 1, 2001, and recodified as amended at *N.J.A.C.* 6A:26–6.2(c)4. That planning and construction regulation, both formerly and as amended, prescribes educational facility exit requirements, and provides that "[d]oors from all spaces used by students and school staff ...

quired that every door to a room used by school staff have an unobstructed safety-vision panel. The exterior windows to Bracigliano's office were also obscured by half-drawn shades and overgrown hedges. During Bracigliano's tenure, state monitors conducting a routine inspection ordered that the paper covering the office-door window be removed. Undeterred, Bracigliano replaced the paper shortly thereafter, and the window remained covered until his arrest.

According to one witness, Linda Herina, a former sixth-grade teacher at the elementary school, the Board was aware of the actions of the state monitors. Ms. Herina overheard one member of the Board comment, during a break at a Board meeting, that the monitors had ordered that the paper masking the window looking into Bracigliano's office be taken down. At no time did the Board take measures to assure that the door window complied with administrative regulations.

It was not uncommon for numerous boys to come to Bracigliano's office each day, many, one at a time. Bracigliano was known to be an avid photographer, and frequently took pictures of students, faculty, and school events. Some of those photographs were displayed on the walls of the school. His secretary, Patricia Showers, would often hear the click of a camera and the pop of flashbulbs from behind the closed door after students entered Bracigliano's office. The door "was always locked," even when students visited. Ms. Showers was unable to see into the office because of the paper covering the door window. Although "comments were made" among the elementary school staff about the covered window and locked door, "there was nothing ... [they] could do. He was [their] superior." Some staff members believed that Bracigliano's frequent habit of calling students to his office from their classrooms simply reflected his positive interaction with

---

shall swing into the corridor and shall have a safety vision panel of 1/4 inch glazing which is not less that 100 square inches." *N.J.A.C.* 6A:26–6.2(c)4; *Frugis, supra,* 351 *N.J.Super.* at 350 n. 3, 798 A.2d 614.

students. Others found the habit "annoying" and "disruptive," but did not attach any untoward significance to it.

Joan Gerard, the elementary school's English–as–a–Second–Language teacher, had believed at first that Bracigliano merely had a preference for boys that was not "unwholesome." However, approximately three years before his arrest, she witnessed Bracigliano "rocking back and forth" against a first-grader that he "had ... standing against [a] wall." She "really panicked," because "[i]t appeared ... to be sexual in nature." She believed at the time that "reporting any kind of abuse to [the Division of Youth and Family Services (DYFS)]" had to go through the school nurse's office. She dutifully reported the incident to the elementary school nurse substituting that day, Rose Klink. Ms. Gerard was unaware of any procedure for reporting such an incident to Bracigliano's superiors.

Nurse Klink did not pass the information along to the Board of Education because she too was unaware of any reporting protocol. A short time later, Nurse Klink witnessed an incident in her own office that caused her alarm. Bracigliano walked into the nurse's office and "put his arms around [a] boy and started to push against the student." Nurse Klink was "shocked" and in disbelief and decided she had to "stop this." She stood up and walked around her desk. Only then did Bracigliano "pull[ ] away from the student." Nurse Klink considered the conduct "definitely inappropriate," and would have reported the incident to the principal, had Bracigliano not been the principal himself. Unaware of any alternate reporting procedure, she related her concerns to the regular elementary school nurse, Karen Glouster. And there, apparently, the report found its final resting place.

Karen Rockefeller, who taught remedial reading and writing, also observed conduct that she considered "odd." One morning, she saw one of her students against the wall outside a classroom, and Bracigliano "was in front of the child rocking back and forth and pushing into him .... hitting him with his stomach." She "thought it was intimidation" and mentioned the incident to Ms.

Gerard and Ms. Glouster. Ms. Rockefeller knew of no procedure for reporting the matter to the administrators of the Elmwood Park school system.

Ms. Herina, the sixth-grade teacher, recalled walking a very shy sixth-grade boy down a hallway one day, when Bracigliano approached them and warned the student that he would "have to learn how to talk more or Mr. B's going to have to spank you." Ms. Herina found the comment "inappropriate," and told Bracigliano to "knock it off." She did not report the incident. She did, however, confront Bracigliano again the day before his arrest. That day, two sixth-grade boys in her class returned from the principal's office after a wrestling demonstration at a school assembly. The boys related that Bracigliano took photographs of them while they posed in a seated position. Bracigliano had one of the boys disrobe down to his wrestling shorts. Ms. Herina went to the principal's office and requested copies of the photographs from Bracigliano. He became incensed and insisted that there were none. Ms. Herina arranged for a conference with the boys' mothers for the following day, but Bracigliano was arrested and the meeting never took place.

Not one school staff member who witnessed Bracigliano's questionable behavior toward young male students at the elementary school reported his conduct directly to DYFS or his superiors at the Board. Each was unaware of any procedure for disclosing such information to the Board.

In addition to the incidents at the elementary school, there was the strange matter of Bracigliano's attendance at the weigh-ins of naked athletes on the high school's varsity wrestling team. William Savage, the Elmwood Park High School wrestling coach from 1983 to 1986, found Bracigliano's presence at the weigh-ins "odd" and "out of order." Savage was informed by the school district's athletic director that Bracigliano conducted weigh-ins for the township recreational wrestling program, and wanted to "see how they were done" at the varsity level. Mike Scarpa, a Board member who would frequently "sneak cigarettes" in the adjacent

Physical Education office during the weigh-ins, expressed concern about Bracigliano's presence. Both the athletic director and Scarpa advised Savage "to keep an eye on Bracigliano" at the wrestling weigh-ins and to let them know "if anything happened." On one occasion, Scarpa inquired whether Savage had ever noticed "anything odd" during Bracigliano's attendance. Although Savage said "no," and let Bracigliano "run the weigh-ins" during the 1985–86 school year, he admittedly "wasn't shocked" when Bracigliano was finally arrested. The school superintendent knew of both Scarpa's and Bracigliano's attendance at the high school wrestling team's nude weigh-ins and considered their presence to be "inappropriate," but took no action to stop them.

The Board was aware of another incident that also aroused concern. Its president, Dr. Michael Schill, had once received a complaint directly from a student's mother about Bracigliano because of his insistence that she send her son to him for private counseling sessions during the summer, even though Bracigliano was not a counselor and the school building was officially closed. Dr. Schill reported the incident to then District Superintendent Dr. Victoria Williams, who instructed Bracigliano to "[c]ease and desist." Dr. Williams never "follow[ed] through" by making any inquiry into Bracigliano's overall conduct as principal.

Dr. John Santini, the school district's superintendent from 1978 to 1988, estimated that he had visited the elementary school building once or twice a month, and more frequently when construction and repairs were done in the building. Dr. Santini, however, was uncertain about ever having visited Bracigliano's office during his nearly eight-year tenure as principal.

Dr. Santini listed various reporting mechanisms available to faculty members for airing complaints, such as the teachers' collective-bargaining grievance procedure, their affirmative-action grievance procedure, and a Board policy that permitted discussion between Board and faculty members. He did not, however, explain how those procedures would have enabled teachers and nurses who had concerns about Bracigliano's untoward conduct to

disclose their observations to the Board. Dr. Santini claimed that at the beginning of each school year all staff members and administrators would assemble and he "would mention DYFS . . . [and] the teachers' contract." The record does not disclose precisely what Dr. Santini discussed on the subject of DYFS. However, it is apparent from the record that faculty members at the elementary school were wholly unfamiliar with any procedure for reporting Bracigliano's alarming behavior directly to the Board or to DYFS.

Dr. Santini stated that it was his policy to install windows in all office doors at the schools in the district. He explained that his motivation for doing so was to minimize prolonged visits by Board members who, due to "political" factions and disagreements, would otherwise linger for hours in various administrators' offices. In his mind, the students' safety was "[o]nly [a] secondary" consideration with respect to the windows.

Although Dr. Santini claimed to have made formal written evaluations of Bracigliano annually,[2] he described his meetings with Bracigliano as "[i]nformal, very informal," and typically over an impromptu lunch with several other people. Dr. Santini described Bracigliano as an "excellent" principal, who achieved "marvelous" academic results. He was "shocked" and "astonished" when Bracigliano was arrested.

Dr. Harry Galinsky, plaintiffs' public administration and education expert, stated that "there was an absolute absence of oversight" on the part of the Board and three successive superintendents throughout Bracigliano's tenure as principal. He found the Board "completely indifferent to what was going on in the school system," because it failed to assess the superintendents'

---

[2] We note that only one of the annual performance reviews provided by the Board for this appeal actually pertains to an evaluation of Bracigliano's performance at the elementary school, and that a number of the remaining evaluations from his employment at other Elmwood Park schools suggested that Bracigliano should familiarize himself with the *New Jersey Administrative Code* Title 6 building-safety requirements, through "self-study."

performance "in terms of evaluating other personnel." He found the superintendents' written evaluations of Bracigliano to be "superficial." In his opinion, their failure to make frequent on-site visits to the elementary school to evaluate staff performance and facilitate staff-administration communications "led directly to . . . what happened to the children in this case." Dr. Galinsky also found that the Board had failed in its duty to establish an effective reporting system and to adequately inform the school staff of procedures to be followed in the event they needed to report concerns to the administration. As to the window covering, Dr. Galinsky opined that Bracigliano's practice violated *N.J.A.C.* 6:22–5.4, *see supra* note 1, and that the superintendents' and Board's "indifference" to that violation, and thus to the health and safety of the students, "led to the kind of behaviors that took place behind the covered window."

Acknowledging that the reporting procedures available to the elementary school staff during Bracigliano's tenure were not significantly different from those in other school systems in Bergen County at that time, Dr. Galinsky maintained that the Board's failure to instruct the staff in the proper use of those procedures made them ineffective. He concluded that the superintendents' performance did not "rise to the level of the standard of performance of superintendents around the state." He also concluded that had an effective reporting system been in place, and the superintendents done their job, the children would not have been harmed.

## B.

Shortly after Bracigliano's arrest, nine-year-old B.F. informed his parents that while he was in the second and third grades "he was brought into the [principal's] office on many occasions" and "photographed." B.F.'s parents were shocked when he "very innocently" showed them how he was photographed, spread-legged, on a chair. They listened to their son explain that "he was asked to sit on the principal's lap many times," and that on one

occasion Bracigliano "touched him on his penis." Bracigliano routinely gave B.F. a "swat" on the "butt" when the child left the office.

B.F. had nightmares about Bracigliano for several months after Bracigliano's arrest, and became withdrawn and tearful. Even at the time of trial, B.F. sometimes felt "depressed" and "would cry" when he thought of his experiences with Bracigliano. B.F. received psychotherapy and social-skills counseling for a span of three years, from the third through sixth grades. On the recommendation of a social worker, B.F.'s parents enrolled him in a private Catholic school for the fourth grade. B.F.'s parents had originally planned to have their children educated in public schools, but elected to send them to private school as a result of their son's experience with Bracigliano.

Plaintiffs' psychiatric expert, Dr. Michael Feldman, expressed the view that B.F. suffered from "post-traumatic stress disorder" and "attention deficit hyperactivity disorder," as well as from "depression" and "social phobia." From that diagnosis, Dr. Feldman arrived at several conclusions. First, he concluded that it was "very probable that [B.F.'s] difficulties ... [were] caused by the abusive experiences he had with [Bracigliano]." He also concluded that B.F.'s psychological damage was "permanent and ... significant," with a "very guarded and potentially poor" prognosis. Last, he determined that the impact of B.F.'s symptoms on his life would increase, rather than decrease, over time. Dr. Feldman conceded that B.F. had not received psychiatric treatment of any kind since 1992 and suffered from attention-deficit and developmental disorders that pre-existed his experiences with Bracigliano.

Dr. David Gallina, the Board's psychiatric expert, delineated B.F.'s neurological problems and developmental delays that predated Bracigliano's abuse. He reported that although B.F.'s anxiety increased as a result of his experiences with Bracigliano, B.F. had "gotten a lot better over the last couple of years," and

was "a pretty well functioning kid" who did not suffer from post-traumatic stress or any other serious neuropsychiatric disorder.

R.H. was eight years old at the time of Bracigliano's arrest. Upon learning of the arrest, R.H. became "hysterical," and ultimately revealed to his parents the embarrassing details of what had occurred in Bracigliano's office. At trial, R.H. remembered being called to the principal's office over the public-address system while in the second and third grades. He also remembered Bracigliano photographing him in various poses in a chair, including the "spread-legged" pose. In choreographing one picture, Bracigliano "opened" R.H.'s pants. For another, he had R.H. take off his shirt to "expose his muscles." To secure R.H.'s silence, Bracigliano used various forms of intimidation, including threatening to send him away from home and to suspend him from school.

After R.H.'s revelations to his parents, he suffered from nightmares and waking fears that Bracigliano "would come after him if he ever got loose." R.H.'s parents enrolled him in therapy, which continued until the middle of his freshman year in high school. At his therapist's suggestion, R.H. was transferred to a private Catholic school in his fourth-grade year. His parents also transferred their twin daughters from the Elmwood Park's public school system to the same private school the following fall.

Dr. Feldman also served as R.H.'s psychiatric expert. He opined that R.H. suffered from "depression and anxiety related to the child sexual abuse by [Bracigliano]" and that R.H. "continued to suffer from residual symptoms of post-traumatic stress disorder, including intense psychological distress when reminded of the abuse." He concluded that R.H.'s "psychological damages [were] permanent," and that his symptoms would likely "be triggered and recur" at different developmental milestones in R.H.'s life, such as "beginning work, finding work, finding a partner, [and] starting a family." Dr. Feldman did acknowledge, however, that R.H. had not received any psychological treatment since 1995, and that it was possible that it was R.H.'s parents who still "had a problem

with the abuse [and] that [R.H.] was, in effect, over it." He also conceded that many of R.H.'s symptoms were not atypical for teenage boys.

The Board's expert, Dr. Gallina, noted that R.H., like B.F., had experienced "a lot of anxiety and some social difficulties" prior to his experience with Bracigliano and that the experience had temporarily exacerbated that anxiety. He concluded that although R.H. "still had some residual symptoms of anxiety," they were "not to the proportion that one would say that he had a serious psychiatric illness," such as post-traumatic stress disorder.

Before closing arguments, the trial court directed a liability verdict in favor of plaintiffs on their negligence and negligent supervision claims against the Board, and on their negligence, intentional tort, and 42 *U.S.C.A.* § 1983 claims against Bracigliano. The trial court declined to submit to the jury the issue of apportionment of liability between the Board and Bracigliano and the issue of lost future income in calculating any award for B.F. and R.H.

The jury returned a damages verdict on plaintiffs' negligence claims in the amounts of $275,000 to B.F. and $117,000 to his parents, and $275,000 to R.H. and $109,250 to his parents. The trial court entered judgment on all claims against Bracigliano.

## C.

The parties raised a number of issues on appeal and cross-appeal to the Appellate Division. We address only those issues that are before this Court: the directed verdict on the Board's negligence, and the trial court's refusal to submit the issues of apportionment of liability and plaintiffs' diminished-earning capacity to the jury. The appellate panel reversed the trial court's directed verdict against the Board and held that, although "the evidence of Bracigiliano's misconduct was overwhelming," a reasonable fact-finder could have found that "under all the circumstances the Board was not negligent." The panel reached that conclusion while acknowledging the "evidence of Bracigliano's

unusual conduct," and the "evidence that the Board did nothing in response." *Frugis, supra,* 351 *N.J.Super.* at 351, 798 *A.*2d 614.

The appellate panel also concluded that *N.J.S.A.* 59:9–3.1 mandated apportionment of liability between the Board and Bracigliano and that the trial court erred by not submitting the issue to the jury. *Id.* at 357–59, 798 *A.*2d 614. The panel affirmed the trial court's decision to withhold plaintiffs' lost-future-income claims from the jury, for lack of sufficient expert testimony as to their future-earning capacities. *Id.* at 359, 798 *A.*2d 614.

We granted certification on the above issues. 174 *N.J.* 194, 803 *A.*2d 1165 (2002).

## II.

The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours. While their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards. No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others. Although the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care. A board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate parents during the day are educating, not endangering, and protecting, not exploiting, vulnerable children. With those fundamental principles in mind, we address plaintiffs' claims.

Plaintiffs contend that the Appellate Division erred in reversing the trial court's directed verdict on the issue of the Board's liability for negligence. Plaintiffs argue that the evidence of the Board's liability was overwhelming, including: the Board's acquiescence in the violation of an administrative regulation by permitting Bracigliano to cover his office window so that no one could see

the abuse that occurred behind his closed, locked door; the Board's failure to instruct adequately teachers and staff on procedures for reporting the abuse of students by a high-ranking administrator, such as a principal, to appropriate authorities; and the Board's failure to make reasonable inquiries in response to information about Bracigliano's odd behavior, such as his uninvited presence at the nude weigh-ins of the varsity wrestlers and his efforts to counsel a young student at the school during the summer months when the building was officially closed.

The Board, on the other hand, contends that the directed verdict was appropriately set aside because "a reasonable factfinder could have concluded that [the Board] was not negligent," based on evidence: that Bracigliano was considered "a competent, well-respected, and well-liked school administrator"; that no one attributed untoward motives to his frequent hailing of students to his office or to his obscured office-door window; that the elementary school staff "had at least three reporting mechanisms available for reporting inappropriate behavior by a faculty member"; and that those reporting procedures "were brought to the attention of the staff at the beginning of each school year" and were the same as those "generally available in Bergen County."

In determining whether a directed verdict was properly granted under *Rule* 4:40–1, we apply the same standard that governs the trial courts. *Luczak v. Township of Evesham*, 311 *N.J.Super.* 103, 108, 709 *A.*2d 305 (App.Div.), *certif. denied*, 156 *N.J.* 407, 719 *A.*2d 639 (1998). As in a summary judgment motion, we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995) (internal quotation marks and citation omitted). If, giving the Board the benefit of the most favorable evidence and inferences to be drawn from that evidence, "reasonable minds could differ" as to the outcome, the contested issues must be submitted to a jury. *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706

(1969). However, if the evidence and uncontradicted testimony is "so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury." *Ferdinand v. Agric. Ins. Co.*, 22 *N.J.* 482, 494, 126 *A.*2d 323 (1956).

The ultimate issue to be decided is whether the Board failed "to use that degree of care, precaution and vigilance which a reasonably prudent [school board] would use under the same or similar circumstances." *Model Jury Charge (Civil)*, 5.10, "Negligence and Ordinary Care—General," (pre–1984). The duties of school officials to students are set forth in Model Civil Jury Charge 3.32:

> School personnel owe a duty to exercise reasonable care for the safety of students entrusted to them. This duty extends to supervisory care required for the student's safety or well-being as well as to the reasonable care for the student at school-sponsored activities in which the student participates.
>
> The standard of care is that degree of care which a person of ordinary prudence, charged with comparable duties, would exercise under the circumstances.
>
> The duty may be violated by not only the commission of acts but also in the neglect or failure to act.
>
> The theory behind the duty is that the relationship between the child and school authorities is not a voluntary one but is compelled by law. The child must attend school and is subject to school rules and discipline. In turn, the school authorities are obligated to take reasonable precautions for his/her safety and well-being.
>
> [*Model Jury Charge (Civil)*, 5.32, "Duty of Teacher and School Personnel to Student," (Sept. 1980).]

█ We agree with the trial court that "a conclusion of negligence on the part of the [Board] was irresistible from the proofs." *Dolson, supra,* 55 *N.J.* at 8, 258 *A.*2d 706. The undisputed facts reveal that the Board did not fulfill its most basic obligation—to protect the children in its care—because it failed to implement effective rudimentary reporting procedures that would have informed it of Bracigliano's misconduct and because it grossly disregarded critical information, either in its hands or easily accessible, that called for scrutiny of Bracigliano's activities.

From the inception of Bracigliano's eight-year tenure as principal, he covered the office-door window in violation of *N.J.A.C.* 6:22–5.4(c). The covering permitted Bracigliano to take 176 pho-

tographs of children in sexually provocative poses—that is, to commit 176 acts of abuse—behind a closed, locked door. After state monitors inspected the elementary school and had the paper removed from the window, Bracigliano boldly replaced it when the coast was clear, having no fear of enforcement by the school administration. The Board knew of the state monitors' actions, but did not follow up to ensure that Bracigliano was in compliance. The continuing violation of *N.J.A.C.* 6:22–5.4(c), which required the principal's door window to be transparent, although not negligence *per se,* was evidence of the Board's failure to supervise Bracigliano and to enforce a regulation designed to ensure student safety. *J.S. v. R.T.H.,* 155 *N.J.* 330, 348, 714 *A.2d* 924 (1998). Although Bracigliano was an avid photographer, as noted by the trial court, no one questioned why many of the pictures being taken did not appear for school-sanctioned purposes.

Ms. Gerard and Nurse Klink witnessed Bracigliano rocking his body back and forth into children in a sexually-suggestive, inappropriate way, but knew of no procedure for reporting those incidents to Bracigliano's superiors. Nurse Klink disclosed her concerns to the full-time nurse, Ms. Glouster, but apparently Ms. Glouster did not report to administration officials. Ms. Rockefeller observed similar conduct, but thought that Bracigliano was intimidating or bullying a student. She too knew of no reporting procedure. Those witnesses, particularly Ms. Gerard and Nurse Klink, had an independent obligation to report directly to DYFS. *See N.J.S.A.* 9:6–8.10 ("Any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to [DYFS]...."); *J.S., supra,* 155 *N.J.* at 343, 714 *A.2d* 924 (noting that "[t]he duty to report is not limited to professionals, ... but is required of every citizen"). The failure to do so, standing alone, was evidence of negligence, vicariously imputable to the Board. *See J.S., supra,* 155 *N.J.* at 349, 714 *A.2d* 924. That two teachers and a nurse did not disclose observed instances of misconduct to school administration officials in Elmwood Park reflected either a lack of report-

ing protocols or a failure to instruct school staff in their use. The grievance procedure pursuant to the teacher's collective-bargaining agreement, the affirmative-action grievance procedure, and the general policy that permitted Board members to speak with faculty clearly were not intended to be communication conduits for reporting a principal's aberrant behavior with students.

Bracigliano's routine appearances at the high-school wrestlers' nude weigh-ins were considered suspect by a Board member and the wrestling coach, and inappropriate by Superintendent Santini, yet the Board was not spurred into action. Bracigliano became a fixture at the weigh-ins, and the Board ignored telltale signs that should have prompted at least a cursory inquiry. The Board also knew of a parent's complaint of Bracigliano's attempts to "counsel" a student at the school during the summer months while the building was closed. That incident prompted a "[c]ease and desist" order from the Board to Bracigliano. Because the school district administration did not have adequate reporting procedures or training in the use of such procedures, Superintendent Santini and the Board failed to put together the varied strands of Bracigliano's strange and aberrant behavior that were known by teachers, staff, and administrators. Any school administrator visiting Bracigliano's office should have known of his violation of the clear-window policy. But, apparently, no one bothered to pay him a call at his office. The plaintiff children were subjected to humiliating indignities in the principal's office in the last two years of Bracigliano's reign at the elementary school. Those young students, as well as others, could have been spared the psychological harm inflicted had the Board exercised an appropriate degree of care.

Bracigliano's well-respected status as an effective school administrator should not have insulated him from oversight, particularly in light of the observed acts of his questionable and deviant behavior. The Board claims that it acted reasonably, that its reporting procedures met acceptable educational standards, and that it did not have sufficient information to put it on notice of the years of wrongdoing behind Bracigliano's closed door. We dis-

agree. We conclude, on this record, that the uncontested proofs, when viewed in their totality, are so overpowering that a reasonable trier-of-fact could not find an absence of negligence on the Board's part.

We encourage school districts to promulgate policies that will guide school staff in reporting the abuse of students by *anyone*, at any level in the educational hierarchy and to implement training programs to ensure the effectiveness of a zero-tolerance-of-abuse policy.[3] Such steps are consistent with a school's *parens patriae* role and will promote the safety and welfare of New Jersey's children, while lessening the likelihood that school districts will have to defend against abuse-based suits. *See Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 624, 626 *A.*2d 445 (1993) (holding that employers can be liable for supervisory sexual harassment, regardless of actual or constructive notice, if they "negligently or

---

[3] *See N.J.S.A.* 18A:36–25 ("All school districts shall be required to establish policies designed to provide for the early detection of ... abused children. These policies shall include provisions for the notification of the appropriate law enforcement and child welfare authorities...."); *N.J.A.C.* 6A:16–1.4(a)21 ("Each district board of education shall approve written policies and programs governing ... [r]eporting of suspected child abuse and neglect to [DYFS] and cooperation in the investigation of child abuse and neglect pursuant to *N.J.A.C.* 6A:16–10.2."); *N.J.A.C.* 6A:16–10.2(a)1 (Those "policies and procedures shall ... [i]nclude provisions requiring school personnel ... to immediately report to [DYFS].... The person reporting ... shall inform the school principal or designee of the report after the [DYFS] referral has been made" unless "the person believes that such notice would be likely to endanger the referrer or child(ren) involved." Any "[s]chool personnel having reasonable cause to believe that a child has been subjected to ... acts of child abuse ... as defined under *N.J.S.A.* 9:6–8.9 shall immediately report to [DYFS]."); *N.J.A.C.* 6A:16–10.2(a)6 (Those "policies and procedures shall .... [i]nclude provisions for the annual delivery of information and in-service training programs to school personnel concerning child abuse or neglect ... and personnel responsibilities pursuant to *N.J.S.A.* 9:6–8.10 *et seq.*"); New Jersey Task Force on Child Abuse and Neglect, *Child Abuse and Neglect: A Professional's Guide to Identification, Reporting, Investigation and Treatment*, app. Recognizing and Reporting Institutional Abuse, The Educator's Role in Child Abuse and Neglect (1996), *available at* http://www.state.N.J.us/ humanservices/ NJTaskForce/ gtfmodel.html (discussing institutional child abuse, reporting requirements and procedures, and sample implementing board of education policy and procedures).

recklessly fail[ ] to have an explicit policy that bans sexual harassment and ... provides an effective procedure for the prompt investigation and remediation of such claims").

## III.

Plaintiffs contend that the Appellate Division mistakenly construed *N.J.S.A.* 59:9-3.1 to mandate apportionment of fault between the Board and Bracigliano. They posit that apportioning fault between the Board's negligence and Bracigliano's misconduct may lead to the lion's share of fault falling on Bracigliano as the intentional tortfeasor and, presumably, away from the Board's "deep pocket." That, they argue, will diminish the Board's duty of care to prevent acts of wrongdoing, particularly by the Board's own staff, against students in its charge. They conclude that apportionment, under those circumstances, is contrary to public policy and the state constitutional guarantee of a thorough and efficient education.

The Board contends that the common law may not be used to expand the liability of public entities and that plaintiffs' proposed construction of *N.J.S.A.* 59:9-3.1, eliminating apportionment between tortfeasors, "ignores the clear terms of that provision and the overriding legislative intent of the [TCA]." The Board reasons that not apportioning fault for plaintiffs' injuries makes the public entity liable not only for its own negligence, but vicariously liable for Bracigliano's criminal conduct as well.

We agree with the Appellate Division that *N.J.S.A.* 59:9-3.1 requires apportionment of fault between the Board and Bracigliano. Plaintiffs have raised legitimate concerns regarding the just application of apportionment in the circumstances of this case. Nevertheless, we are constrained to apply the statute and not substitute our public policy preferences for the Legislature's mandate placing limitations on the liability of public entities. In applying *N.J.S.A.* 59:9-3.1, however, we offer guidelines for assessing the relative degrees of fault between a negligent school board and an abusive school official to minimize the likelihood of

diluting the board's responsibility to protect its students from foreseeable dangers, including those presented by staff members. Any other remedy must come from the Legislature.

■ Thirty years ago, this Court abrogated common-law sovereign immunity in tort cases against public entities. *Willis v. Dep't of Conserv. & Econ. Dev.*, 55 *N.J.* 534, 536–40, 264 *A.*2d 34 (1970). In response, the Legislature enacted the TCA, which restored *limited* sovereign immunity in such cases. *Alston v. City of Camden*, 168 *N.J.* 170, 176, 773 *A.*2d 693 (2001); *Fluehr v. City of Cape May*, 159 *N.J.* 532, 539, 732 *A.*2d 1035 (1999); Harry A. Margolis & Robert Novack, *Title 59—Claims Against Public Entities*, at ix (2003). The Legislature declared that it was "the public policy of this State that public entities shall *only* be liable for their negligence *within the limitations of [the TCA]." N.J.S.A.* 59:1–2 (emphasis added). "[I]mmunity for public entities is the rule and liability is the exception." *Fluehr, supra,* 159 *N.J.* at 539, 732 *A.*2d 1035. In light of that overriding policy, the TCA has been construed to allow the finding of liability against public entities only when permitted by the Act. *Pico v. State,* 116 *N.J.* 55, 59, 560 *A.*2d 1193 (1989).

■ We now address the doctrine of comparative fault as it applies to this case. The TCA "eliminat[ed] the harsh doctrine of contributory negligence," which barred a negligent plaintiff from receiving any recovery for his injuries from the party that wronged him. Margolis, *supra,* at 229, reprinting 1972 Task Force Report Comment on section 59:9–4. In its place, the TCA put a system of comparative fault that allowed the apportioning of liability among the parties, including joint tortfeasors. *Id.* at 231.

■ In cases involving joint tortfeasors, the TCA limits a public entity's liability to an injured party to the entity's percentage of fault. Three interrelated provisions deal with principles of comparative fault as they apply to a public entity: *N.J.S.A.* 59:9–3.1, *N.J.S.A.* 59:9–3, and *N.J.S.A.* 59:9–4. *N.J.S.A.* 59:9–3.1 provides:

> *Notwithstanding the provisions of [the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A–1 to –5, and the Comparative Negligence Act, N.J.S.A. 2A:15–5.1 to –5.8,] or any other law to the contrary,* in any case where a public entity or public employee acting within the scope of his employment is determined to be a tortfeasor in any cause of action along with one or more other tortfeasors, the public entity or public employee shall be liable for no more than that percentage share of the damages which is equal to the percentage of the negligence attributable to that public entity or public employee and only to the extent authorized by [*N.J.S.A.* 59:9–2 [4] and –4, *infra*].
>
> [*N.J.S.A.* 59:9–3.1 (emphasis added).]

*N.J.S.A.* 59:9–3.1, by its express language, stands alone in determining a public entity's liability relative to joint tortfeasors. We are therefore enjoined from considering common-law and non-TCA statutory constructs on joint tortfeasors that are inconsistent with the dictates of *N.J.S.A.* 59:9–3.1. *See N.J.S.A.* 59:1–3 (" 'Law' includes enactments and also the decisional law applicable within this State as determined and declared . . . by the courts. . . ."). Although *N.J.S.A.* 59:9–3.1 states that a public entity is liable only for its percentage of negligence, that provision requires a comparison of the negligent public entity to "one or more other tortfeasors." *N.J.S.A.* 59:9–3.1. *N.J.S.A.* 59:9–3.1 does not limit apportioning fault to only "negligent" tortfeasors, but rather embraces "other tortfeasors," which includes both negligent acts and intentional wrongdoing.

The legislative history of *N.J.S.A.* 59:9–3.1 also reveals that its objective was to "eliminate[ ] joint and several liability for public entities," and to limit an injured party's recovery to "the percentage of the amount of the judgment which is directly attributable to the negligence of the public entity." *Assemb. Ins. Comm. Stmt. to Senate, No. 375—L. 1987, c. 324, reprinted in N.J.S.A.* 59:9–3.1.

---

[4] At the time of trial, *N.J.S.A.* 59:9–2d provided, in relevant part, that no damages would be awarded against a public entity or employee "for pain and suffering resulting from any injury," in the absence of "permanent loss of a bodily function . . . [and] medical treatment expenses . . . in excess of $1000." *L.* 1972, *c.* 45, § 1. There is no dispute that plaintiffs' total medical expenses met that threshold. The statute was subsequently amended, increasing the medical treatment expense requirement to "in excess of $3,600." *N.J.S.A.* 59:9–2d (*L.* 2000, *c.* 126, § 32, eff. Sept. 21, 2000).

The very purpose of *N.J.S.A.* 59:9–3.1 "was to increase protection for public entities by limiting liability for them." *Furey v. County of Ocean*, 273 *N.J.Super.* 300, 318, 641 *A.2d* 1091 (App.Div.), *certif. denied*, 138 *N.J.* 272, 649 *A.2d* 1291 (1994).

*N.J.S.A.* 59:9–3 provides that a public entity's obligation to contribute to a joint tortfeasor is confined to its percentage of liability. That provision supports the conclusion that the TCA mandates apportionment of liability between joint tortfeasors:

> Notwithstanding any other law, in any case where a public entity or public employee acting within the scope of his employment is determined to be a joint tortfeasor[,] the public entity or public employee shall be required to contribute to a joint tortfeasor only to the extent of the recovery provided for under this act.
>
> [*N.J.S.A.* 59:9–3.]

"The language, 'to the extent of the recovery provided for under this act,' refers to the limitations contained in 59:9–2[,] ... 59:9–3.1[,] ... and 59:9–4." Margolis, *supra*, comment on *N.J.S.A.* 59:9–3 at 223 (quoting *N.J.S.A.* 59:9–3). Moreover, to the extent that *N.J.S.A.* 59:9–3 is inconsistent with the Joint Tortfeasors Contribution Law, the TCA is controlling. *Ibid.*

Last, *N.J.S.A.* 59:9–4 provides the mechanics for determining the relative degrees of fault between joint tortfeasors. The statutory language is framed in terms of comparative negligence:

> In all negligence actions in which the question of liability is in dispute, the trier of fact shall make the following as findings of fact:
>
> a. The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence, that is, the full value of the injured party's damages to the extent permitted under this act.
>
> b. The extent, in the form of a percentage, of each party's negligence. The percentage of negligence of each party shall be based on 100% of [sic] the total of all percentages of negligence of all the parties to a suit shall be 100%.
>
> [*N.J.S.A.* 59:9–4a, –4b.]

Although *N.J.S.A.* 59:9–4b refers to the term "negligence" instead of "fault," which might, when viewed in isolation from other provisions of the TCA, suggest an exclusion of intentional acts from the comparative fault analysis, this Court has interpreted an identical provision of the Comparative Negligence Act, former *N.J.S.A.* 2A:15–5.2b, to require the apportionment of fault for both

negligent and intentional acts. *See Blazovic v. Andrich,* 124 *N.J.* 90, 97–98, 106–08, 590 *A.*2d 222 (1991).[5]

Determining whether the TCA requires apportionment of liability between a negligent public entity and an intentional tortfeasor is a matter of first impression for this Court. However, *Blazovic v. Andrich, supra,* 124 *N.J.* 90, 590 *A.*2d 222, provides a framework for analyzing the present case. In *Blazovic,* we examined whether apportionment of liability between private negligent and intentional joint tortfeasors was compelled by former *N.J.S.A.* 2A:15–5.2b, the then-identical Comparative Negligence Act analogue to *N.J.S.A.* 59:9–4b. In *Blazovic,* several persons who patronized the barroom of a restaurant assaulted another patron, plaintiff, in the restaurant's parking lot. 124 *N.J.* at 93, 590 *A.*2d 222. The plaintiff alleged that the restaurant's service of alcohol to the assailants and its negligence in failing to provide adequate lighting and security in the parking lot made possible the assault by the intentional tortfeasor patrons. *Id.* at 94, 590 *A.*2d 222.

After surveying a number of cases that addressed the arguments for and against apportionment between negligent and intentional tortfeasors, *id.* at 100–02, 590 *A.*2d 222, we held that the "responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the

---

5 Former *N.J.S.A.* 2A:15–5.2b provided that the trier of fact had to determine "[t]he extent, in the form of a percentage, of each party's negligence. The percentage of negligence of each party shall be based on 100% and the total of all percentages of negligence of all the parties to a suit shall be 100%." *Blazovic, supra,* 124 *N.J.* at 98, 590 *A.*2d 222. In 1995, the Legislature adopted *Blazovic's* holding that fault must be apportioned between negligent and intentional joint tortfeasors, and amended the Comparative Negligence Act accordingly. *See N.J.S.A.* 2A:15–5.2a(2) (mandating that liability be apportioned according to "each party's negligence *or fault*") (emphasis added); *L.* 1995, *c.* 140, § 1 (amending former *N.J.S.A.* 2A:15–5.2b). Although the Legislature did not simultaneously similarly amend *N.J.S.A.* 59:9–4b, there is no reason why *Blazovic's* holding, to the extent just described, would not equally apply to the joint tortfeasor liability apportionment mandated by *N.J.S.A.* 59:9–4b, because that holding is not contrary to, and indeed furthers the TCA's aim of circumscribing public entity tort liability through apportionment of fault.

fault attributable to an intentional tortfeasor." *Id.* at 107, 590 *A.*2d 222. We arrived at that conclusion despite former *N.J.S.A.* 2A:15–5.2b's explicit reference only to *negligent* private joint tortfeasors. *See supra* note 5. As noted, that provision is identical to *N.J.S.A.* 59:9–4b, which we now construe.

In light of the express aim of the TCA to limit public entity liability, we see no justification for interpreting *N.J.S.A.* 59:9–4b to achieve a result that would expose public entities to greater liability awards than similarly-situated private parties under the Comparative Negligence Act. Given the dictates of the TCA, it would be anomalous indeed to prohibit apportionment between a negligent public entity and an intentional tortfeasor, but to permit such apportionment among private parties when the statutory provision we construed in *Blazovic* is the same rule we construe here. In *Blazovic,* we rejected the approach called for by the dissent in the Appellate Division—the suspension of a comparative fault analysis in cases "where a defendant's negligence consists only of failing to secure adequately against the independent intentional wrongdoing of third parties that results in injury to a plaintiff." 124 *N.J.* at 97, 590 *A.*2d 222.

We also recognized, in dictum,

a line of cases decided by this Court in which we have precluded defendants from relying on a *plaintiff's* negligence to offset the defendant's duty, under circumstances in which the defendant's duty encompassed the obligation to prevent the plaintiff's allegedly-inappropriate conduct. *Cf. Cowan v. Doering,* 111 *N.J.* 451, 458–67, 545 *A.*2d 159 (1988) (hospital could not assert contributory negligence as defense when its duty included exercise of reasonable care to prevent plaintiff from engaging in self-damaging conduct); *Suter [v. San Angelo Foundry & Mach. Co.],* 81 *N.J.* [150,] 165–68, 406 *A.2d* 140 [(1979)] (comparative negligence not available as defense in products-liability case when factory worker sustains injury while using unsafe machine for its intended purpose); *Soronen v. Olde Milford Inn, Inc.,* 46 *N.J.* 582, 589–92, 218 *A.2d* 630 (1966) (contributory negligence not available as defense to tavern keeper who negligently sells alcoholic beverages to visibly-intoxicated customer, proximately contributing to resulting injury).

[*Id.* at 111, 590 *A.*2d 222 (emphasis added).]

Those cases all involved whether comparative fault should have applied between a negligent defendant and a plaintiff who was alleged to have contributed to his own injuries. In those cases,

"we recognized that the inappropriate imposition of a comparative-negligence defense could lead to the dilution or diminution of a duty of care." *Ibid.* (internal quotation marks omitted). We understood "that the reasoning underlying those decisions could appropriately be applied to preclude apportionment of fault between [defendant] tortfeasors when the duty of one encompassed the obligation to prevent the specific misconduct of the other." *Ibid.* (citing *Butler v. Acme Mkts., Inc.,* 89 *N.J.* 270, 445 *A.*2d 1141 (1982)). Nevertheless, in *Blazovic,* we "adhere[d] to the general principle that liability should be imposed in proportion to [the] fault" of each of the parties, including the plaintiff, because the events which took place in the parking lot were not sufficiently foreseeable and causally connected to the restaurant's negligence to justify imposing the entire responsibility for the plaintiff's injuries on the restaurant alone. *Id.* at 112, 590 *A.*2d 222.

Neither the language nor legislative intent of the TCA support the use of *Blazovic's* dictum to eliminate a comparative-fault analysis in the present case. To import *Blazovic's* dictum into the TCA to abrogate apportionment between a negligent public entity and an intentional tortfeasor under *N.J.S.A.* 59:9–3.1 and –4 would extend a public entity's liability beyond that intended by the Legislature. *N.J.S.A.* 59:9–3.1 plainly states that the language of that provision controls even in the face of decisional law to the contrary, which necessarily includes the dictum in *Blazovic.*

We have "emphasized repeatedly that when interpreting a statute, our overriding goal must be to determine the Legislature's intent." *Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998) (internal quotation marks omitted). The statute's language is ordinarily the "surest indicator" of that intent. *Ibid.* If the language is plain and clearly reveals the statute's meaning, the Court's sole function is to enforce the statute according to its terms. *Ibid.* If the statute suggests more than one interpretation, the broader legislative scheme, its history, and relevant sponsor statements may also inform the Court's interpretation in light of the statute's overall policy and purpose.

*See id.* at 234–36, 708 *A.*2d 401. Here, the language and legislative history of *N.J.S.A.* 59:9–3.1, and indeed the entire legislative scheme of the TCA, as well as our decision in *Blazovic,* lead us to conclude that *N.J.S.A.* 59:9–3.1 mandates apportionment. Although there are persuasive public policy arguments that the Board alone should be held responsible for plaintiffs' injuries caused by Bracigliano's intentional wrongs to give a strong incentive to all boards to fulfill their duty to safeguard their students, we must enforce the language and purpose of the TCA.

We do, however, have a paradigm for the use of jury instructions to provide guidance in identifying and assessing important factors in determining apportionment between negligent and intentional tortfeasors. In *Steele v. Kerrigan,* 148 *N.J.* 1, 689 *A.*2d 685 (1997), this Court suggested guidelines for instructing a jury on how fairly to apportion liability in a case where a negligent tavern had a duty of care to protect a patron from violent acts of another patron. We revisited and affirmed *Blazovic* within the context of the Licensed Alcoholic Beverage Server Fair Liability Act (Beverage Server Act), *N.J.S.A.* 2A:22A–1 to –7. We examined the issue of proper apportionment of fault among a tavern that negligently served alcohol to a minor patron, the minor who assaulted another patron, and the patron whose negligence may have contributed to the assault. *Steele, supra,* 148 *N.J.* at 10–15, 689 *A.*2d 685. We reviewed analogous provisions of the Beverage Server Act, *N.J.S.A.* 2A:22A–6b, and the social host provision of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.8, which eliminate joint and several liability for alcohol servers and echo the language of *N.J.S.A.* 59:9–3.1. *See Steele, supra,* 148 *N.J.* at 21, 689 *A.*2d 685. We found it "clear that the Legislature intended that comparative negligence principles be used to apportion fault between multiple defendants ... and that recovery from the tavern be limited to the percentage apportioned, notwithstanding the fact that a blameless plaintiff may be unable to recover fully in cases where one or more tortfeasors are insolvent." *Id.* at 22, 689 *A.*2d 685. However, because of the unique circumstances of *Steele* in comparison to typical dram-shop actions—the negligent service

of alcohol to a minor who committed an assault—we enunciated a set of "practical guidelines" for the trial court to follow on the remand when instructing the jury on apportionment of liability. *Id.* at 27, 689 *A.*2d 685. Those guidelines included that jury instructions be given on the purpose of imposing tavern liability under the Beverage Server Act, the heightened duty of taverns to underage patrons, and the foreseeability of risk that a tavern's negligent service might induce assaultive conduct. *Id.* at 33–34, 689 *A.*2d 685.

In light of the strong public policy considerations that must inform the decision-making process in assessing comparative fault in a case of a board of education that fails to exercise due care in protecting its students from the very persons in charge of protecting those students, we conclude that similar guidelines are equally appropriate here. Therefore, with respect to apportionment of liability between Bracigliano and the Board, the· jury on remand should be instructed on the heightened duty of school boards to ensure students' safety from foreseeable harms, particularly those presented by the intentional acts of school personnel.

Specifically, the jury should be instructed that:

- in considering how to apportion liability, it must consider the peculiar concerns that surround the education of children, including their safety and security;

- a school board stands in *parens patriae,* in the role of a parent, to students while they are entrusted to its care;

- children do not voluntarily elect to attend school—they are required to do so by law, and are subject to school rules and discipline;

- children are a vulnerable class by virtue of their age and immaturity, and, therefore, it is expected not only by their parents and guardians, but by society as a whole, that school personnel will take all reasonable measures to protect students' health, safety, and well-being;

- a school board has a duty to protect students entrusted to its care from foreseeable risks of harm, including intentional harms caused by school personnel—the very people who are charged with their care;

- the jury's apportionment of liability should reflect the extent to which the school board's failure to discharge its duties exposed the students in its care to intentional misconduct by one of its employees;

- the jury's apportionment of liability should not diminish the school board's overriding duty to protect students from foreseeable intentional torts by school personnel;
- the jury may consider whether the school board promulgated effective policy guidelines for the reporting of student abuse and whether school personnel were trained in their use.

The use of such powerful instructions carries the potential of creating prejudice to school boards in the liability and damages portion of a trial. Accordingly, the better practice would be to have the jury first determine who, if anyone, is at fault among the parties, and then to determine the total damages award. Last, the jury should be charged on apportionment of damages and determine the allocation of fault. The jury should be instructed in advance of that two-phase procedure to be followed by the court. We refer to the Supreme Court Committee on Model Jury Charges (Civil) the preparation of a model charge on apportionment consistent with this opinion.

In light of these instructions, we do not find persuasive plaintiffs' argument that the Appellate Division's construction of *N.J.S.A.* 59:9–3.1 violates the Thorough and Efficient Education Clause of our State Constitution, *N.J. Const.* art. VIII, § 4, ¶ 1. *See In re Commitment of W.Z.*, 173 *N.J.* 109, 126, 801 *A.*2d 205 (2002) (noting that "[i]n construing a challenged statute, courts will "assum[e] that the Legislature intended to act in a constitutional manner," " and will "seek to avoid a statutory interpretation that might give rise to serious constitutional questions") (internal quotation marks omitted).

## IV.

Finally, we must decide whether the trial court properly withheld from the jury the issue of lost future earnings of B.F. and R.H. Each was approximately eight years old when abused by Bracigliano. By the time of trial, both had turned eighteen, and a clearer picture of their capabilities and career prospects had emerged. The only testimony, however, that even remotely touched on the subject of their future-earning capacity came from

tidbits of testimony of Dr. Feldman, the psychiatric expert for the two boys.

On the subject of B.F.'s employment prospects, Dr. Feldman "expected" that B.F. would "have significant problems presenting himself in new situations ... such as at a job interview .... [or in] being assertive or ambitious in terms of his career." Nevertheless, B.F. was a "good" student both before and after Bracigliano's arrest, and was an "excellent" student in high school. He received invitations to attend Pennsylvania State University and Rutgers University, and chose Rutgers. He expressed interest in the field of meteorology.

With regard to R.H.'s career future, Dr. Feldman opined that he would "likely ... have difficulties with ... employment or with interviewing if he perceived that the authority figures were people who might be either critical ... or suspicious of him." Dr. Feldman also offered that R.H.'s psychological distress and depressive disorders would likely "be triggered and recur" at particular milestones in his life, such as "beginning" and "finding work." Dr. Feldman was no more specific on what career opportunites would be lost to R.H. than he was in his testimony concerning B.F. Notwithstanding Dr. Feldman's prognostications, R.H. was an honor student throughout his grade and high school education and scored 1220 on his Scholastic Aptitude Test. He also participated in numerous extracurricular activities, including competing on the track team, editing the school newspaper, serving as vice-president of the school's computer club, tutoring other students, and assisting with the school's community service club and a local community food bank. At the time of trial, R.H. was attending the College of New Jersey with a major in computer science, and had obtained summer employment as a customer service representative.

The Appellate Division found that the trial court properly exercised its discretion in not submitting the issue of lost or diminished future income to the jury. We agree.

An injured party has the right to recover damages for diminished-earning capacity if there is a "basis in the evidence" to warrant submission of the issue to the jury. *Lesniak v. County of Bergen,* 117 *N.J.* 12, 20, 563 *A.*2d 795 (1989); *Dombroski v. City of Atlantic City,* 308 *N.J.Super.* 459, 469, 706 *A.*2d 242 (App.Div. 1998) (citing *Caldwell v. Haynes,* 136 *N.J.* 422, 433, 643 *A.*2d 564 (1994)). In *Coll v. Sherry,* 29 *N.J.* 166, 148 *A.*2d 481 (1959), this Court set forth the standard in adult injury cases for instructing a jury on such damages. A plaintiff must present evidence that there is (1) "a reasonable probability that his injuries will impair his future earning capacity" and (2) "sufficient factual matter upon which the *quantum* of diminishment can reasonably be determined." *Id.* at 176, 148 *A.*2d 481. Ordinarily, expert testimony would be required to establish the severity of the injury and its connection to the diminution of future-earning capacity, as well as the amount of the predicted lost income. *Lesniak, supra,* 117 *N.J.* at 31, 563 *A.*2d 795.

However, in the case of a severely injured child, this Court eliminated the need for proof to establish the second prong of the *Coll* standard, the quantum of diminished income. *Id.* at 25, 563 *A.*2d 795. In *Lesniak v. County of Bergen, supra,* a seven-year-old boy suffered a traumatic left-hemisphere brain injury when a thirty-pound tree limb fell forty feet and struck his head while he was seated at a picnic table in a county park. *Id.* at 15, 563 *A.*2d 795. The injured boy, who had turned sixteen by the time of trial, presented extensive expert testimony on permanent cognitive and motor-skill disabilities that impaired his ability to perform general tasks requiring either manual dexterity or reading comprehension and word-retrieval. *Id.* at 21–22, 563 *A.*2d 795. In those circumstances, the Court held that

when recovery is sought for impairment of an infant plaintiff's future income-earning capacity, the jury should be permitted to consider that element of damage when the evidence demonstrates a permanent or lasting injury *of the kind that renders it reasonably probable, rather than merely possible, that the capacity to earn a living will be affected.* When that reasonable probability has been established, evidence quantifying the amount of the lost income is not a prerequisite to recovery in the case of an infant. The severe nature and lasting extent of

> that class of injury must be established by expert medical testimony in all but the most obvious cases, *e.g.,* traumatic amputation; but expert testimony is not required either to connect the permanent injury with loss of ability to work or to quantify the diminishment of earning capacity.
>
> [*Id.* at 33, 563 A.2d 795 (emphasis added).]

This Court recognized an exception to the *Coll* standard because "there is always going to be limited evidence, if any at all, permitting a concrete calculation of future earnings" in cases involving injured infants. *Id.* at 26, 563 A.2d 795.

Plaintiffs argue that no expert testimony on the quantum of lost future income was required in light of *Lesniak.* They contend that neither B.F. nor R.H. had yet entered the adult workforce, making any calculation of their lost future earnings impossible, despite their academic successes and ages at the time of trial. The Board counters that plaintiffs did not present adequate expert testimony to satisfy either prong of the *Coll* standard, and that even under *Lesniak,* plaintiffs did not adduce the requisite threshold evidence demonstrating " 'a permanent or lasting injury of the kind that renders it reasonably probable, rather than merely possible, that the capacity to earn a living will be affected.' " (quoting *id.* at 32, 563 A.2d 795).

We need not decide whether plaintiffs were required to present expert testimony on the quantum of lost future income because, in the circumstances of this case, we conclude that plaintiffs failed to meet the threshold test for invoking the *Lesniak* rule. Plaintiffs simply did not present sufficient evidence to support the conclusion that their psychological injuries made it reasonably probable that their ability to earn a livelihood would be impaired. *Id.* at 22, 563 A.2d 795. Dr. Feldman's bare "expectations" that B.F. would "have significant problems presenting himself in new situations ... such as at a job interview .... [or in] being assertive or ambitious in terms of his career," and that R.H. "would be likely to have difficulties with ... employment or with interviewing if he perceived that the authority figures were people who might be either critical ... or suspicious of him," were too speculative for a

jury to find impairment of career opportunities and award damages on that basis.

We do add, however, that had plaintiffs presented sufficient evidence of diminution of future-earning capacity as a result of their injuries, the better course would have been to offer expert testimony on the quantum of their loss, in light of their ages at the time of trial. Their lost future-earning capacity would have been "'susceptible to measurement by methods of projection more definite than can reasonably be applied in the case of an infant whose aptitudes, skills, capacity and inclinations have yet to meet worldly tests.'" *Id.* at 14, 563 *A.*2d 795 (quoting *Lesniak v. County of Bergen,* 219 *N.J.Super.* 468, 478, 530 *A.*2d 816 (App.Div. 1987) (Landau, J., dissenting)). *See generally* Douglas M. Foley, *Infants, Lost Earning Capacity, and Statistics: Sound Methodology or Smoke and Mirrors?,* 13 *Geo. Mason U.L.Rev.* 827 (1991). Although expert testimony is not required, as a general rule, to establish the *quantum* of earning-capacity loss in cases involving minor plaintiffs, this case is different. The Appellate Division concluded, and we agree, that "[h]ere, unlike *Lesniak,* there was a basis for an expert to provide an opinion as to the future earning capacity of B.F. and R.H. in light of their age." *Frugis, supra,* 351 *N.J.Super.* at 361, 798 *A.*2d 614.

We, therefore, conclude that the trial court properly exercised its discretion in not submitting the issue of lost or impaired future earnings to the jury.

## V.

In summary, we reinstate the trial court's directed verdict against the Board and affirm the judgment of the Appellate Division in all other respects. We remand the matter to the Law Division for a trial on apportionment consistent with this opinion, with the caveat that the damages verdict need not be disturbed. After the apportionment trial, the court shall mold the verdict accordingly.

COLEMAN, J., concurring in the judgment.

I concur in the judgment of the Court. I would not undertake to write the jury charge, but would instead refer the matter to the Civil Jury Charge Committee. An appropriate jury charge will eliminate the necessity of bifurcating the liability trial to determine fault and then determine the percentage of fault of the respective parties.

*For affirmance in part/reversal in part/remandment*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI, and ALBIN—7.

*Opposed*—None.