NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4397-18T2

RONALD RAFANELLO,

      Plaintiff,

v.

JORGE S. TAYLOR-ESQUIVEL,
INTEK AUTO LEASING, INC.,
ENCOMPASS INSURANCE AND
ESURANCE,

      Defendants-Appellant,

and

ENCOMPASS PROPERTY &
CASUALTY INSURANCE
COMPANY OF NEW JERSEY,

      Third-Party Plaintiff/
      Appellant,

v.

AMERICAN MILLENNIUM
INSURANCE COMPANY,
NAB TRUCKING, LLC, AVS
INSURANCE AGENCY, INC.,
INTEK AUTO LEASING, INC.,
EMPIRE FIRE AND MARINE
INSURANCE COMPANY,

      Third-Party Defendants/

> **APPROVED FOR PUBLICATION**
>
> **November 23, 2020**
>
> **APPELLATE DIVISION**

Respondent,

and

AMERIPRISE INSURANCE as
Subrogee of JOHN HENDERSON,

Fourth-Party Plaintiff,

v.

NAB TRUCKING LLC, JORGE
TAYLOR-ESQUIVEL, INTEK
AUTO LEASING INC.,

Fourth-Party Defendants.

_____

ENCOMPASS PROPERTY &
CASUALTY INSURANCE
COMPANY OF NEW JERSEY,
individually and as Subrogee of
RONALD RAFANELLO,

Plaintiffs-Appellants,

v.

INTEK AUTO LEASING, INC.,
NAB TRUCKING, LLC, JORGE S.
TAYLOR-ESQUIVEL, AMERICAN
MILLENNIUM INSURANCE
COMPANY & EMPIRE FIRE &
MARINE INSURANCE COMPANY,
AVS INSURANCE AGENCY, INC.,
and ADMIRAL INSURANCE
COMPANY,

Defendants-Respondents.

_____

A-4397-18T2

ENCOMPASS INSURANCE
COMPANY OF NEW JERSEY as
subrogee of NEIL PRUPIS
and ENCOMPASS INSURANCE
COMPANY OF NEW JERSEY,

      Plaintiffs,

v.

JORGE TAYLOR-ESQUIVEL,
NAB TRUCKING and INTEK
AUTO LEASING, INC.,

      Defendants.

_____

Submitted September 16, 2020 – Decided November 23, 2020

Before Judges Fuentes, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket Nos. L-3488-15 and L-1721-17.

Hardin, Kundla, McKeon & Poletto, PA, attorneys for appellant Encompass Property & Casualty Insurance Company of New Jersey; and Steven G. Kraus, attorney for appellant Encompass Property & Casualty Insurance Company of New Jersey, individually and as subrogee of Ronald Rafanello and Neil Prupis (James L. Fant and Steven G. Kraus, on the joint briefs).

Mintzer Sarowitz Zeris Ledva & Meyers, LLP, attorneys for respondent American Millennium Insurance Company (Kimberly A. Murphy and Christopher A. Gulla, on the brief).

The opinion of the court was delivered by

FIRKO, J.A.D.

Defendant and third-party plaintiff Encompass Property & Casualty Insurance Company of America (Encompass) appeal from a January 18, 2019 order granting summary judgment to third-party defendant American Millennium Insurance Company (AMIC) and denying Encompass's cross-motion for summary judgment as to AMIC. The trial court found that in this multi-vehicle accident involving a commercial dump truck, the step-down provision in the AMIC policy was triggered because defendant Jorge S. Taylor-Esquivel, the dump truck driver, was not listed in the Covered Driver's section of the policy procured by his employer, NAB Trucking, LLC (NAB). The trial court determined that NAB's exposure was capped at $35,000.

The issue on appeal is whether New Jersey law requires a commercial motor vehicle carrier, such as NAB, to provide the minimum insurance coverage amount of $750,000, when engaged in interstate or intrastate commerce, as prescribed by N.J.S.A. 39:5B-32 and N.J.A.C. 13:60-2.1, even in the event an individual is not listed as a covered driver on the policy. We answer in the affirmative and conclude, as a matter of law, that the AMIC insurance policy issued to NAB requires a mandatory minimum insurance coverage amount of $750,000 and the step-down provision in the insured's

combined single limit (CSL) policy is not triggered. Therefore, we reverse and remand.

I.

We discern the following facts from the summary judgment record and view them in the light most favorable to the respective non-moving parties. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). On September 22, 2015, plaintiff Ronald Rafanello was rear-ended by a dump truck operated by Taylor-Esquivel in West Orange on Route 280, during the course of his employment with NAB. Upon impact, Rafanello's vehicle struck a third motor vehicle owned by plaintiff Neil Prupis. Debris was dumped onto a fourth motor vehicle owned by Angelo Abrego and a fifth motor vehicle owned by fourth-party plaintiff John Henderson. Rafanello suffered personal injuries as a result of the accident. Notably, the dump truck was a 2006 Sterling L-9800 and weighed in excess of 26,001 pounds. NAB leased the dump truck from Intek Auto-Leasing, Inc. (Intek). At the time of the accident, Taylor-Esquivel was hauling a load of dirt obtained from Four Landscaping in New Jersey to Newark.

Encompass is the automobile insurance provider for Rafanello. The policy issued by Encompass to Rafanello provided uninsured and underinsured motorist coverage of $250,000 per person and $500,000 per accident.

5

The lease agreement between NAB and Intek provided that NAB

> will be responsible for providing and maintaining the following insurance coverages in the minimal amounts and the maximum deductibles listed below: Personal injury liability: $1,000,000/$1,000,000
>
> . . . .
>
> If for any reason you fail or refuse to secure insurance coverage on amount stated above or cease to maintain such coverage during the term of the lease, lessor [Intek] shall supply the insurance to the lessee [NAB].

In August 2015, NAB, through its insurance broker, AVS Insurance Agency, Inc. (AVS), secured coverage for the dump truck from AMIC. NAB submitted information to AVS about its owner, Jaime Colindres Mejia, and dump truck drivers, Mejia and Taylor-Esquivel. Copies of Taylor-Esquivel's driver's license and social security card were provided to AVS with the intent to include him as a covered driver on the NAB policy.

A Commercial Insurance Application and Supplemental Commercial Application were submitted by AVS on behalf of NAB and listed two additional drivers, Luis Vega and Donald Colindres. While motor vehicle record searches for Vega and Colindres were submitted with the Commercial Insurance Application to AMIC, a motor vehicle search was not submitted for Taylor-Esquivel. Taylor Stroud, an AVS representative, advised NAB that

Taylor-Esquivel would not qualify as a covered driver because his driving history was "unacceptable."

The Commercial Insurance Application identified Keasbey as NAB's business location and stated NAB hauled sand and gravel within a "[seventy-five] mile radius." In the Supplemental Commercial Application submitted by NAB, the following answers were given to questions regarding interstate commerce:

> 2. Do you require filings (Y/N)? N
> DOT[1] #? 2560477
>
> MC[2] # (if applicable)? NA.
>
> 3. Does your company conduct any business or travel outside of the [S]tate of New Jersey (Y/N)? Y.
>
> If so, identify all states in which your company does business or travels to. Pennsylvania.

At a deposition, AMIC's underwriter acknowledged that based upon NAB's answer on the Supplemental Commercial Application, NAB engaged in "interstate transport."

---

[1] United States Department of Transportation. Interstate movers transporting passengers or hauling cargo must be registered with the Federal Motor Carrier Safety Administration (FMCSA) and have a USDOT number.

[2] Motor Carrier number. An MC number is assigned by the FMCSA to companies operating in interstate commerce hauling cargo across state lines.

A-4397-18T2

AMIC issued a Commercial Automobile Policy to NAB for the policy period from August 6, 2015 to August 6, 2016.  The policy provided liability coverage of $750,000 per accident on the declarations page.  The dump truck involved in the subject accident is identified in the schedule of "Specifically Described Autos."  The AMIC policy provides coverage to the "Named Insured," NAB Trucking, and any permissive user of a covered "auto."

The "Who is an Insured" section of the AMIC policy defines the following as "insureds":

> a. You for any covered "auto."
>
> b. Anyone else while using with your permission a covered "auto" you own, hire or borrow . . .
>
> c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

The policy also includes a step-down provision, which provides for a maximum coverage limit of $35,000 for liability arising from incidents involving an individual who is not listed as a "Covered Driver" under the policy.  Taylor-Esquivel was not listed as a covered driver in the "Schedule of Covered Drivers" section of the policy.

8

The policy did not include an MCS-90 endorsement,[3] a federal endorsement for interstate truckers. Mejia testified that NAB was not involved in interstate commerce. Tim O'Shea, an AMIC representative, testified that

> [a]s a matter of practice in underwriting, we normally react to the presence of an MC number, so if an insured is engaged in interstate commerce, we leave it up to the insured that they should be aware that they're engaging in interstate commerce and it would be up to the insured to obtain a[n] MC number, which, then, if that number is provided to the insurance company, would enable us to complete a federal filing and attach the MCS 90 endorsement.

Mejia ultimately signed the policy, which did not include Taylor-Esquivel as a covered driver or an MCS-90 endorsement. On August 6, 2015, AVS issued a Certificate of Liability Insurance representing to Intek that the AMIC policy was issued to NAB and afforded $1,000,000 in liability coverage; included the dump truck involved in the accident; and named Intek as an additional insured under the policy.

On October 19, 2015, Rafanello filed an amended complaint against Taylor-Esquivel, Intek, and Encompass alleging he was entitled to underinsured (UIM) motorist coverage from Encompass because there was insufficient insurance coverage under the AMIC policy issued to NAB. On

---

[3] An MCS-90 endorsement is attached to an insurance policy issued to a motor carrier and is proof that the motor carrier has met the financial requirements of the federal regulations for motor carriers. See 49 U.S.C. § 13906.

September 16, 2016, the trial court entered an order permitting AMIC to deposit its $35,000 policy limit into court pursuant to Rule 4:57-1.[4] In accordance with the terms of the order, on November 16, 2016, AMIC deposited its $35,000 payment with the Superior Court Trust Fund.

On May 8, 2017, Encompass filed a complaint against AMIC, NAB, Intek, Taylor-Esquivel, and Empire Fire & Marine Insurance Company for reimbursement of Personal Injury Protection (PIP) benefits. On June 26, 2017, AMIC filed an answer to the complaint. Thereafter, on March 27, 2018, Encompass filed a second amended third-party complaint against AMIC, NMAB, AVS, Intek, and Empire. Encompass alleged it was not required to provide underinsured motorist coverage benefits to Rafanello because his claims did not exceed the $1,000,000 policy limit required under the lease agreement between NAB and Intek. On April 16, 2018, AMIC filed an answer to Encompass's second amended third-party complaint.

On November 7, 2018, AMIC filed a motion for summary judgment arguing it deposited the "full $35,000 policy limit into the [c]ourt" because the

---

[4] Rule 4:57-1 provides in pertinent part:

> In any action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money, a party, on notice to every other party, and by leave of court, may deposit with the Superior Court Trust Fund all or any part of the sum.

policy's step-down provision was triggered. On December 11, 2018, Encompass filed a cross-motion for summary judgment.

On January 18, 2019, the Law Division judge heard oral argument and placed his decision on the record. The judge granted AMIC's motion and denied Encompass's cross-motion. In his decision, the judge found that the step-down provision in the policy was triggered because the policy was clear and unambiguous, and AMIC's exposure was $35,000 because Taylor-Esquivel was not listed as a covered driver on NAB's policy. The appeal followed.

II.

On appeal, Encompass argues that the judge erred by granting AMIC's motion for summary judgment. Encompass contends AMIC is obligated to provide liability coverage for claims against NAB and Taylor-Esquivel in the amount of $750,000 as mandated by New Jersey state law and federal law because the dump truck involved in this accident was a commercial motor vehicle engaged in interstate commerce, intrastate commerce, or both. In the alternative, Encompass argues there is a genuine issue of material fact as to whether NAB was engaged in interstate commerce, which would trigger federal statutes requiring AMIC to provide NAB with a minimum insurance coverage amount of $750,000. AMIC argues that NAB was not involved in

interstate commerce at the time of the accident and did not execute an MCS-90 Endorsement, requiring affirmance.

"An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge." New Jersey Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 452 (App. Div. 2019) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Rule 4:46-2(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."

"If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Brill, 142 N.J. at 540 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). The court "should not hesitate to grant summary judgment" if "the evidence 'is so one-sided that one party must prevail as a matter of law.'" Ibid. (quoting Liberty Lobby, 477 U.S. at 252).

We review the trial court's grant of summary judgment de novo under the same standard as the trial court. Templo Fuente De Vida Corp. v. Nat'l

Union Fire Ins. Co., 224 N.J. 189, 199 (2016). Where there is no issue of material fact and only a question of law remains, we give "no special deference to the legal determinations of the trial court." Ibid., (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

For the first time on appeal, Encompass argues that there is a genuine issue of material fact as to whether Taylor-Esquivel should have been identified in the "Covered Driver" section of the policy, in which case the AMIC policy should be deemed to conform to NAB's reasonable expectations. Here, AMIC argues that the trial court properly held "no facts exist to support a finding that [Taylor-Esquivel] was listed as a 'Covered Driver' on the AMIC policy and/or that NAB had a reasonable expectation that [Taylor-Esquivel] would be a 'Covered Driver.'"

Encompass contends that regardless of whether NAB was engaged in intrastate commerce or both intrastate and interstate commerce, N.J.S.A. 39:5B-32 and N.J.A.C. 13:60 to -2.1 required AMIC to provide NAB with a minimum liability coverage amount of $750,000. On the other hand, AMIC contends that N.J.S.A. 39:6B-1 governs the minimum liability insurance coverage for NAB, and N.J.S.A. 39:5B-32 or N.J.A.C. 13:60-2.1 are not applicable.

A-4397-18T2

To determine a question of statutory construction, our Court recently confirmed the guiding principles judges must follow:

> Our objective in interpreting any statute is to give effect to the Legislature's intent. Frugis v. Bracigliano, 177 N.J. 250, 280 (2003). When the clear language of the statute expresses the Legislature's intent, our analysis need go no further. Shelton v. Restaurant.com, Inc., 214 N.J. 419, 429 (2013). When a plain reading of the statute allows for more than one plausible interpretation or leads to an absurd result or a result at odds with the overall statutory scheme, we may turn to extrinsic evidence. DiProspero v. Penn, 183 N.J. 477, 492-93 (2005).
>
> [McClain v. Bd. of Review, Dept. of Labor, 237 N.J. 445, 456 (2019).]

Importantly, when interpreting a statute, it must be read "in context with related provisions so as to give sense to the legislation as a whole." DiProspero, 183 N.J. at 492. "Additionally, 'whatever the rule of [statutory] construction, it is subordinate to the goal of effectuating the legislative plan as it may be gathered from the enactment read in full light of its history, purpose, and context.'" Chasin v. Montclair State Univ., 159 N.J. 418, 426-27 (1999) (alteration in original) (quoting State v. Haliski, 140 N.J. 1, 9 (1995)).

Under Title 39, the Legislature has promulgated regulations to differentiate certain classes of motor vehicles from the general class of motor vehicles. See N.J.S.A. 39:3B-1 to -28; N.J.S.A. 39:3C-1 to -36; N.J.S.A. 39:4-31.1 to -31.5; N.J.S.A. 39:5H-1 to -27. Additionally, the Legislature has

14

specified the mandatory insurance requirements for these differing classes of motor vehicles, which either align with the minimum insurance coverage requirements mandated by N.J.S.A. 39:6B-1 or an increased minimum insurance coverage requirement. See N.J.S.A. 39:6B-1; N.J.S.A. 39:3C-20; N.J.S.A. 39:4-31.3(b).

However, where the Legislature has adopted a separate statutory scheme for a class of motor vehicles and has not specified the amount of compulsory liability insurance coverage required, it has delegated that authority to the Commissioner of Insurance in consultation with the Director of the Division of Motor Vehicles. N.J.S.A. 17:1-1; see N.J.S.A. 39:4-14.3(e). Moreover, where our Legislature has adopted federal statutes and regulations into its own regulatory scheme for a specific class of motor vehicle, it has clearly delineated the portions of the federal law applicable in our State. See N.J.S.A. 39:3B-27.

In distinguishing vehicles transporting hazardous materials from the general class of motor vehicles, our Legislature enacted a statutory scheme pursuant to N.J.S.A. 39:5B-1 to -32. N.J.S.A. 39:5B-18 to -31.1 establishes standards for the transportation of hazardous materials within the State of New Jersey. Specifically, N.J.S.A. 39:5B-26 provides:

> The [Department of Transportation], in consultation
> with the Department of Environmental Protection, the

A-4397-18T2

Department of Labor, the Department of Commerce and Economic Development, the Divisions of Motor Vehicles and State Police of the Department of Law and Public Safety, and other appropriate State departments and agencies shall adopt, within [twelve] months of the effective date of this act and pursuant to the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C. 52:14B-1 to -31), rules and regulations concerning the transportation of hazardous materials, which shall, to the maximum extent practicable, conform to the requirements established by 49 CFR Parts 100-199, adopted by the United States Department of Transportation pursuant to the provisions of the "Hazardous Materials Transportation Act," Pub.L. 93-633 (49 U.S.C. §§ 1801-1812).

However, the Legislature also afforded additional authority to the Superintendent of the State Police to promulgate additional regulations:

The Superintendent of the State Police shall adopt, within six months of the effective date of this amendatory and supplementary act and pursuant to the "Administrative Procedure Act," P.L. 1968, c. 410 (C. 52:14B-1 to -31), rules and regulations concerning the qualifications of interstate motor carrier operators and vehicles, which shall substantially conform to the requirements established pursuant to sections 401 to 404 of the "Surface Transportation Assistance Act of 1982," Pub.L.97-424 [49 U.S.C. §§ 31101-31104].[5]

[N.J.S.A. 39:5B-32(a) (emphasis added).]

These sections of the Surface Transportation Assistance Act of 1982 establish a federally funded Motor Carrier Safety Assistance Program for the

---

[5] Formerly found at 49 U.S.C. App. § 2301-2304.

16

purpose of improving "motor carrier, commercial motor vehicle, and driver safety to support a safe and efficient surface transportation system," which would be implemented by states. 49 U.S.C. § 31102(b). 49 U.S.C. § 31101(1)[6] defines a commercial motor vehicle as

> a self-propelled or towed vehicle used on the highways in commerce principally to transport passengers or cargo, if the vehicle—
>
> (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
>
> (B) is designed to transport more than 10 passengers including the driver; or
>
> (C) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103.
>
> [(Emphasis added).]

Further, a motor carrier is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

To ensure federal funding under this program, states are required to create a plan, which, among many other requirements, requires the state to "cooperate in the enforcement of financial responsibility requirements under sections 13906, 31138, and 31139 and regulations issued under those

---

[6] See also 49 C.F.R. § 390.5.

sections." 49 U.S.C. § 31102(c)(2)(Q). Additionally, 49 U.S.C. § 31102(c)(2)(Y)(i) provides: "the State will conduct safety audits of interstate and, <u>at the State's discretion, intrastate new entrant motor</u> carriers under section 31144(g)[.]" (Emphasis added). Further, 49 U.S.C. § 31102(e) provides:

> The Secretary shall prescribe regulations specifying tolerance guidelines and standards for ensuring compatibility of intrastate commercial motor vehicle safety laws, including regulations, with [f]ederal motor carrier safety regulations to be enforced under subsections (b) and (c). To the extent practicable, the guidelines and standards shall allow for maximum flexibility while ensuring a degree of uniformity that will not diminish motor vehicle safety.

As a prerequisite to adopting the federal scheme, New Jersey had to comply with the Motor Carrier Safety Assistance Program. The Legislature provided:

> b. The superintendent, in consultation with the New Jersey Motor Vehicle Commission and with the Department of Transportation, shall revise and readopt, within six months of the effective date of <u>P.L.</u> 1991, <u>c.</u> 491, the rules and regulations adopted pursuant to subsection a. of this section to provide that the regulations:
>
> (1) Substantially conform to the requirements concerning the qualifications of interstate motor carrier operators and vehicles established pursuant to sections 401 to 404 of the "Surface Transportation Assistance Act of 1982," <u>Pub.L.</u> 97-424 [49 U.S.C. § 31101-31104] and the federal "Motor Carrier Safety

Act of 1984," Pub.L. 98-554 [49 U.S.C. § 31131-31151];[7] and

(2) Include provisions with regard to motor carrier operators and vehicles engaged in intrastate commerce or used wholly within a municipality or a municipality's commercial zone, except for farm vehicles weighing 26,000 pounds or less that are operated exclusively in intrastate commerce and are registered pursuant to [N.J.S.A.] 39:3-24 and [N.J.S.A.] 39:3-25, that are compatible with federal rules and regulations.

Notwithstanding subsection c. of this section, the hours of service variances as adopted in 49 CFR § 350.341(e), as amended and supplemented, are hereby adopted effective immediately for commercial motor vehicles weighing 26,001 pounds or more operating in intrastate commerce provided that these vehicles are not designed to transport 16 or more passengers, including the driver, or used in the transportation of hazardous materials and required to be placarded in accordance with 49 CFR § 172.500-172.521 or display a hazardous materials placard. The superintendent shall adopt rules and regulations that conform to the requirements established in 49 CFR § 350.341(e) as amended and supplemented.

[N.J.S.A. 39:5B-32(b)(1) to -32(b)(2) (emphasis added).]

Against this backdrop, our Legislature clarified:

Notwithstanding any provision of law or regulation to the contrary, no person shall operate a commercial motor vehicle, as defined in rules adopted pursuant to this section, in this State unless the operation of the

---

[7] Formerly found at 49 U.S.C. § 2501 to 2519.

commercial motor vehicle is in accordance with the
rules adopted by the Superintendent of State Police
pursuant to this section.

[N.J.S.A. 39:5B-32(c) (emphasis added).]

Our Legislature clarified that "[t]he superintendent shall enforce
financial responsibility requirements under 49 U.S.C. 13906 and 31139, and 49
CFR Part 387." N.J.S.A. 39:5B-32(e). 49 U.S.C. § 31139(b) provides that
"[t]he Secretary of Transportation shall prescribe regulations to require
minimum levels of financial responsibility sufficient to satisfy liability
amounts established by the Secretary covering public liability, property
damage, and environmental restoration for the transportation of property by
motor carrier[,]" and "[t]he level of financial responsibility . . . shall be at least
$750,000." Further, 49 CFR § 387.9 provides:

| Type of carriage | Commodity transported | January 1, 1985 |
|---|---|---|
| (1) For-hire (In interstate or foreign commerce, with a gross vehicle weight rating of 10,001 or more pounds) | Property (nonhazardous) | $ 750,000 |

Under N.J.S.A. 39:5B-32, our Legislature authorized the Superintendent
of the State Police to promulgate corresponding rules and regulations in the
Administrative Code, N.J.A.C. 13:60 to 13:60-2.1. N.J.A.C. 13:60-1.1
explains the purpose for this section of the Administrative Code:

This chapter establishes rules and regulations concerning the qualifications of motor carrier operators and vehicles engaged in interstate or intrastate commerce or used or operated wholly within a municipality or a municipality's commercial zone, which substantially conform to the requirements established pursuant to sections 401 to 404 of the "Surface Transportation Assistance Act of 1982," Pub. L. 97-424 (49 U.S.C. §§ 31101-31104) and the Federal "Motor Carrier Safety Act," Pub. L. 98-554 (49 U.S.C. §§ 31131-31151), by adopting and incorporating by reference: the "Federal Motor Carrier Safety Regulations," and all supplements and amendments thereto; and Appendices to the "Federal Motor Carrier Safety Regulations," and all supplements and amendments thereto.

[(Emphasis added).]

N.J.A.C. 13:60-1.2 explains the application of this chapter of the Code:

(a) The provisions of this chapter are applicable to every motor carrier and every person, including drivers, agents, employees, and representatives, involved or in any manner related to:

1. The transportation in a commercial motor vehicle of any cargo in interstate or intrastate commerce;

2. The operation of a commercial motor vehicle, with or without a cargo, in interstate or intrastate commerce or wholly within a municipality or a municipality's commercial zone;

3. The transportation in any motor vehicle in intrastate commerce of materials determined by the Secretary of the United States Department of Transportation to be hazardous for the purposes of the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101-5128) and which materials are transported in a quantity requiring

21

hazardous material(s) placarding under Federal Hazardous Materials Regulations (49 C.F.R. Parts 171, 172, 173, 174, 177, 178, 179, and 180) and all supplements and amendments thereto;

4. The operation of a commercial motor vehicle, with or without a cargo, displaying hazardous material(s) placarding in intrastate commerce or wholly within a municipality or a municipality's commercial zone;

5. The transportation in a commercial motor vehicle, as defined at 49 CFR 390.5, to the extent and not inconsistent with this chapter and N.J.A.C. 13:60-2.1(d), in intrastate commerce of any non-hazardous material(s) cargo; and

6. The operation of a commercial motor vehicle, as defined at 49 CFR 390.5, and subject to any prevailing requirements of (a)3 above, in intrastate commerce or wholly within a municipality or a municipality's commercial zone.

[(Emphasis added).]

Further, N.J.A.C. 13:60-1.3 provides:

(c) This chapter establishes minimum standards of compliance concerning the qualifications of motor carrier operators and vehicles, operating in this State in interstate or intrastate commerce or used or operated wholly within a municipality or a municipality's commercial zone. Therefore, in the event of a conflict between this chapter and any other State regulation, except as otherwise provided by statute or law, the stricter, more stringent standard shall apply and govern.

(d) Whenever the term "interstate" is used in the Federal Motor Carrier Safety Regulations, adopted and incorporated, by reference, herein, and all

22

supplements and amendments thereto, it shall, for the purpose of this chapter, mean or include both "interstate" and "intrastate" transportation in commerce and those vehicles used or operated wholly within a municipality or a municipality's commercial zone except where stated otherwise.

. . . .

(g) The provisions and requirements of these regulations as well as the Federal Motor Carrier Safety Regulations adopted and incorporated, by reference, herein, and all supplements and amendments thereto, and made a part hereof as if set forth in full, are applicable to all motor vehicles, as defined in this chapter, engaged in transportation in interstate and intrastate commerce or operating in interstate and intrastate commerce or used or operated wholly within a municipality or a municipality's commercial zone, as well as all motor vehicles engaged in transportation of hazardous material(s) in a quantity requiring hazardous material(s) placarding or displaying hazardous material(s) placarding unless specifically stated otherwise.

[(Emphasis added).]

Importantly, N.J.A.C. 13:60-2.1(b) provides:

The Parts and Appendices of the Federal Motor Carrier Safety Regulations and all supplements and amendments thereto, adopted as final rule action by the Federal Administration, United States Department of Transportation, and adopted and incorporated, by reference, herein, by the Superintendent, are summarized below. Within that list some sections, subparts, or parts may have been modified, revised, amended, made subject to a different effective date, and/or intentionally omitted by the Superintendent.

Those sections, subparts, or parts are clearly identified in (d) below.

. . . .

10. Part 387, Minimum Levels of Financial Responsibility for Motor Carriers.

Thereafter, N.J.A.C. 13:60-2.1(d) provides:

(d) As stated in (a) and (b) above, this chapter generally incorporates 49 CFR Parts 40, 325, 350, 355, 380, 382, 383, 384, 385, 387, 388, and 390 through 398, inclusive, by reference. The following modifications, additions, and deletions apply to those parts:

1. The definition of "commercial motor vehicle" in 49 CFR 390.5 (relating to definitions) is modified to read as follows:

"Commercial motor vehicle" means any self-propelled or towed motor vehicle used on a highway in intrastate commerce to transport passengers or property when the vehicle:

i. Has a gross vehicle weight rating or gross combination weight rating, or a registered weight of 4,536 kg (10,001 pounds) or more, whichever is greater;

. . . .

Here, the express language of N.J.S.A. 13:5B-32 and N.J.A.C. 13:60 to 13:60-2.1 clearly establishes a separate statutory scheme for commercial motor vehicles having a registered weight of 10,001 pounds or more, like the NAB dump truck involved in the subject accident. Moreover, by adopting a

statutory scheme that mirrors the Federal Motor Carrier Safety Act, our Legislature clearly intended to enroll into the Motor Carrier Safety Assistance Program, which provides funding for improving "motor carrier, commercial motor vehicle, and driver safety to support a safe and efficient surface transportation system." N.J.S.A. 39:5B-32(a); 49 U.S.C. § 3112(b). The Legislature intended that these statutes and regulations apply to both intrastate and interstate commerce.

Importantly, N.J.A.C. 13:60-1.3(d) provides "[w]henever the term "interstate" is used in the Federal Motor Carrier Safety Regulations, adopted and incorporated, by reference, herein, and all supplements and amendments thereto, it shall, for the purpose of this chapter, mean or include both "interstate" and "intrastate" transportation in commerce[.]" (Emphasis added). N.J.A.C. 13:60-1.3(g) also provides "[t]he provisions and requirements of these regulations as well as the Federal Motor Carrier Safety Regulations . . . are applicable to all motor vehicles . . . engaged in transportation in interstate and intrastate commerce or operating in interstate and intrastate commerce[.]" (Emphasis added). Additionally, N.J.A.C. 13:60-1.2(a)(1) provides "[t]he provisions of this chapter are applicable to every motor carrier . . . , involved or in any manner related to . . . [t]he transportation in a commercial motor vehicle of any cargo in interstate or intrastate commerce[.]" (Emphasis added).

Here, the NAB dump truck operated by Taylor-Esquivel fits squarely within the definition of a commercial motor vehicle because at the very least, the dump truck was engaged in intrastate commerce. And, the NAB dump truck satisfies the specifications of a commercial motor vehicle as defined by the applicable statutes and regulations. See 49 U.S.C. § 31101(1); 49 C.F.R. § 390.50; N.J.A.C. 13:60-2.1(d) (defining commercial motor vehicles). Moreover, the fact that Taylor-Esquivel was not listed as a covered driver on NAB's policy is irrelevant because that would distort and ignore the impact of the statutes and regulations adopted to insure safety for drivers on public roadways and would be in conflict with the bedrock principles enacted by the ICC. Here, the accident occurred while Esquivel-Taylor was engaged in NAB's business of trucking and hauling dirt, with permission of the owner. Esquivel-Taylor was acting within the scope of his employment, and there is no basis to relieve the insurer of its contractual obligation to its insured.

We recognize that the intent of the statutes and regulations enacted by Congress was to protect drivers and shippers traveling public highways and to guarantee compensation to accident victims injured by vehicles transporting cargo and individuals in interstate commerce. Our Legislature reacted with an express intent on the subject by adopting the federally mandated minimum of $750,000 in insurance coverage for commercial motor vehicles. See N.J.S.A.

39:5B-32(e); N.J.A.C. 13:60-2.1(b); 49 U.S.C. § 31102(c)(2)(Q); 49 U.S.C. § 31139(b); and 49 CFR § 387.9. Saliently, our Legislature expanded upon the federal mandate by expanding the law to cover all motor vehicles engaged in interstate and intrastate commerce transporting cargo. Therefore, we conclude that NAB was engaged in interstate or intrastate commerce, as defined in N.J.S.A. 39:5B-32 and N.J.A.C. 13:60-2.1, and AMIC must provide the minimum insurance coverage of $750,000. The step-down provision is not triggered.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4397-18T2